UNITED STATES of America,
Plaintiff–Appellee,

v.

David W. LANIER, Defendant–Appellant.

No. 93–5608.

United States Court of Appeals,
Sixth Circuit.

Reargued June 14, 1995.

Decided Jan. 23, 1996.

Jessica D. Silver, Thomas E. Chandler (argued and briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, for U.S.

Alfred H. Knight (argued and briefed), Willis & Knight, Nashville, TN, for David W. Lanier.

David W. Lanier (briefed), Dyersburg, TN, pro se.

Before: MERRITT, Chief Judge; KEITH, KENNEDY, MARTIN, JONES, WELLFORD, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, and MOORE, Circuit Judges.

MERRITT, C.J., delivered the opinion of the Court for nine judges, in which KENNEDY, MARTIN, BOGGS, NORRIS, SUHRHEINRICH, and SILER, JJ., concurred in full and in which RYAN and BATCHELDER, JJ., concurred in Parts I and III. WELLFORD (pp. 1394–1397), and NELSON (pp. 1397–1399), JJ., delivered separate opinions concurring in part and dissenting in part, with Judge WELLFORD also concurring in Judge NELSON's opinion. KEITH (pp. 1399–1400), JONES (pp. 1400–1403), and DAUGHTREY (pp. 1403–1414), JJ., delivered separate dissenting opinions, with Judges KEITH and MOORE concurring in Judge DAUGHTREY's dissenting opinion.

MERRITT, Chief Judge.

## I. The Question Presented

This is a direct criminal appeal by a convicted Tennessee state judge. He raises a question of interpretation about 18 U.S.C. § 242, perhaps the most abstractly worded statute among the more than 700 crimes in the federal criminal code. Section 242 was adopted as a codification of prior law in 1874 during the period of Reconstruction in the aftermath of the Civil War. It criminalizes without any further definition the willful "deprivation of any rights ... protected by the Constitution" committed by any person under "color of any law."[1] That is the broad language we must interpret. The specific question before us is whether the sexual harassment and assault of state judicial employees and litigants by the judge violates this federal criminal statute. The statute, as applied in this case, does not specifically

---

1. The evolution of the language of the statute is as follows. In 1874, the crime read:

SEC. 5577. Every person who, under color of any law, statute, ordinance, regulation, or custom, subjects, or causes to be subjected, any inhabitant of any State or Territory to the deprivation of any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color or race, than are prescribed for the punishment of citizens, shall be punished by a fine of not more than $1,000, or by imprisonment not more than one year, or by both. 2 Cong.Rec. 828 (1874).

In 1909, it was amended to add the requirement of wilfulness. 43 Cong.Rec. 3599 (1909). In 1988, it was amended so that the penalty provision would contain: *"and if bodily injury results shall be fined under this title or imprisoned not more than ten years, or both."* 102 Stat. 4396 (1988).

In 1994, after the indictment was returned in this case, § 242 (along with many other criminal statutes) was amended to add the death penalty and other enhanced penalty provisions. The statute now reads as follows (with the new part underlined):

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any *person in* any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of *such person* being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined *under this title* or imprisoned not more than one year, or both; and if bodily injury results *from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire,* shall be fined *under this title* or imprisoned for not more than ten years, or both; and if death results *from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned* for any term of years or for life, *or both, or may be sentenced to death.*

18 U.S.C.A. § 242 (West 1969 & 1995 Supp.), 108 Stat. 1970–71, 2109, 2113, 2147 (1994).

mention or contemplate sex crimes, and including sexual misconduct within its coverage stretches its meaning beyond its original purpose. Thus, the fundamental question before us is whether the statute—tied by its language simply to "constitutional rights"—should receive a fixed definition of criminal liability or should be interpreted as evolving or expanding over time to include the abridgement of new constitutional rights as they are recognized in our civil constitutional law. The courts have developed theories or ingredients of constitutional violations primarily in the civil context, and there is no developed law of constitutional crimes. Section 242 by its terms criminalizes violations of "constitutional rights" only in the abstract, not conduct which is described specifically by federal or state statute. The problem here is to articulate as nearly as possible a theory of constitutional crimes consistent both with constitutional rights declared in civil cases and also consistent with established canons of statutory construction of federal criminal laws.

In *Screws v. United States,* the Supreme Court upheld the constitutionality of § 242 by one vote, with the majority unable to agree on a single rationale. 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). In a five-four decision, the Court narrowly rejected arguments, accepted by the dissenters, that the statute is too indefinite and vague to meet due process standards. These standards require federal criminal statutes to be written with sufficient definiteness to give notice of the criminal conduct for which a person may be punished in federal court.

█ In a long line of cases before and after the *Screws* case, the Supreme Court has sought to apply a fundamental principle limiting the judicial power to extend criminal statutes by interpretation, a long-standing principle articulated in 1820 by Chief Justice John Marshall for a unanimous Court:

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself ... It is the legislature, not the court, which is to define a crime, and ordain its punishment.... It would be dangerous, indeed, to carry the principle, that a case which is within the

reason or mischief of a statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated.

*United States v. Wiltberger,* 18 U.S. 76, 93–94, 5 Wheat. 35, 43–44, 5 L.Ed. 37 (1820). This case stands for a number of fundamental propositions that form the basis of our criminal law, in addition to the principle of strict construction. No matter how outrageous a defendant's actions may be, he has to be charged with the appropriate offense created by federal law. Courts may not create or extend criminal law by using a common-law process of interpretation. If Congress has not been clear about the type of conduct that it wishes to criminalize, courts should not hold a defendant criminally liable by creating a new federal crime.

More recently, Justice Thurgood Marshall observed that reasons of federalism, as well as the necessity of public notice and fair warning, underlie this principle of interpretation:

> [U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States.

*United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).

In this case, the defendant, a state Chancery Court judge from a rural county in West Tennessee, was indicted in eleven counts, three of which were felony counts. The three felony counts charged him with instances of willfully "coercing" a woman "to engage in sexual acts" with him which caused bodily injury (counts 6, 7 and 10). Eight of the counts were misdemeanor counts charging him with various types of "willful sexual assault" by "touching," "grabbing the breasts and buttocks of" or "exposing his genitals to" a woman. The three felony counts charging coercive sexual acts involved two women, and the other eight misdemeanor counts involved six other women. In each count, the constitutional deprivation is described in abstract terms as "the right not to be deprived of

liberty without due process of law" under the Fourteenth Amendment. The government alleges that in each instance the defendant acted "under color of law" by using his official position as a Chancellor to engage in the "willful sexual assault."

The District Court overruled the defendant's motion to dismiss the indictment for failure to state a crime under § 242. Seeking to narrow the potential reach of the statute in sex crime cases, it charged the jury that "it is not ... every unjustified touching or grabbing" that constitutes a constitutional violation, only "physical abuse ... of a serious and substantial nature ... *which is shocking to one's conscious* [sic]" (emphasis added). The jury convicted the defendant of two of the three felony counts and five of the eight misdemeanor counts, for which the District Court sentenced him to a total of twenty-five years imprisonment. He has appealed on numerous grounds, including the failure of the District Court to dismiss the indictment for failure to state a federal crime under § 242.

■ After consideration of the legislative history of this statute, the case law, the long established tradition of judicial restraint in the extension of criminal statutes, and the lack of any notice to the public that this ambiguous criminal statute includes simple or sexual assault crimes within its coverage, we conclude that the sexual harassment and assault indictment brought under § 242 should have been dismissed by the District Court upon motion of the defendant. Thus the conviction and sentence of the defendant is reversed and the indictment dismissed.

In asserting that sexual assault is a constitutional crime, the prosecution proposes that this substantive due process, sexual assault offense be defined as "interference with bodily integrity that shocks the conscience of the court and the jury." The prosecution relies exclusively on this theory. It has neither articulated nor proposed the recognition of a gender-based crime for sexual assault involving discrimination against or oppression of women in violation of the Equal Protection Clause. Nor did the prosecution allege in the indictment, or attempt to prove as an element of the offense, that the state criminal process in Tennessee was incapable of enforcing its own criminal statutes prohibiting sexual assault, nor did the prosecution allege as an element of the § 242 offense that state law enforcement officials have laws, customs, policies or practices that discriminate against or oppress women as a class. There is no claim that state law enforcement officials and state prosecutors, judges or jurors are any less concerned about such crimes than their federal counterparts. Therefore, our opinion addresses only the substantive due process, "shock-the-conscience" crime alleged by the prosecution, not a crime based on equal protection, state-sanctioned abuse, or some other legal theory.

## II. The Legislative History of § 242

Section 242 is an unusual statute, perhaps unique in our legislative history. Scholars and judges frequently question how much emphasis or reliance one should attempt to put on "legislative intent" derived from studying legislative history. Although it is problematic to presume that any deliberative assembly comprised of many legislators will have one cohesive, coherent and decisive "intent" when it passes such an ambiguous statute, or that judges will be able to discern it, *see* Max Radin, *Statutory Interpretation,* 43 HARV.L.REV. 863, 872 (1930), we continue to find it useful to examine the legislative history to confirm or exclude certain interpretations of a statute like the one now before us.

Section 242 was adopted in 1874 as a part of a codification of federal statutes. It attempted to merge three previous sections that had been adopted as part of the 1866 and 1870 Civil Rights Acts and the 1871 Ku Klux Act. In 1909, the Congress added the word "willfully" to the statute. Those legislative acts created the basic language of the statute.

It turns out that the broad language of the 1874 statute, and hence the present language of § 242, arose as a result of a misunderstanding or a confusion in codifying the 1866, 1870 and 1871 Acts. In 1870, Congress commissioned a one-volume compilation of all federal statutes because the sixteen disparate volumes then in existence were too cumber-

some. It hired a codifier, Mr. Durant, to redraft and codify the laws of the United States. He decided to fuse the three statutes from 1866, 1870, and 1871 into one new statute that became § 242. Although in codifying the law he was charged with making no substantive changes, in fact, the one new statute that is now § 242 dramatically expanded criminal liability for civil rights violations if given a literal interpretation and created a new crime that had not previously existed. Congress adopted the new compilation of laws apparently without realizing that any substantive change had been made or that a new, undelineated set of evolving constitutional crimes might be implied from the statute in the future.

On the floor of the House of Representatives, Congressman Lawrence read the three existing sections from the three earlier Acts into the record to illustrate that the new statute Durant proposed, which was to become § 242, changed nothing. But none of the three previous statutes criminalized deprivations of all constitutional rights made under color of law. The 1866 statute—which at the time of enactment was arguably unconstitutional because passed prior to the adoption of the Fourteenth Amendment—criminalized interference under color of law with certain enumerated rights, most notably, contract and property rights and equal protection of the laws.[2] By 1870, the Fourteenth Amendment had been adopted, and Congress in the 1870 Civil Rights Act passed another statute under the authority of the new Amendment that performed the same basic function as the 1866 Act.[3] Finally, Congressman Lawrence mistakenly cited—based on the fact that Durant had mistakenly included—a portion of the 1871 Ku Klux Act as the third predecessor *criminal* statute incorporated in the new condensed criminal statute. That statute provided only for a *civil* remedy for violations under color of law of

2. The Act read as follows:

> That all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race or color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State or Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of the person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.
>
> Sec. 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause or be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishments, pains or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or

> imprisonment not exceeding one year, or both, in the discretion of the court.

2 Cong.Rec. 827 (1874) (citing 14 Stat. 27 (1866)) (emphasis added).

3. The relevant portions of the 1870 Act read by Congressman Lawrence were:

> Sec. 16. *And be it further enacted,* That all persons within the jurisdiction of the United States shall have the same right in every State or Territory of the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding....
>
> Sec. 17. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color, or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000, or imprisonment not exceeding one year, or both, in the discretion of the court.

*Id.* at 827–28 (citing 16 Stat. 144 (1870)) (emphasis added).

any constitutional rights. It was the civil predecessor of § 1983.[4] Durant in his codification continued *civil* liability for the violation of all constitutional rights—a rendition true to the 1871 Act—but he then created what is essentially *a parallel criminal statute* that covered violations of all constitutional and federal statutory rights under color of law. Previously, one could only be held criminally liable if one acted under color of law and violated contract, property or equal protection rights.[5] But the new statute codified by Durant *criminalized* violations of all constitutional rights and all rights protected under federal statutory laws. In effect, the recodification grafted the much broader scope for civil liability onto the criminal statute.

Congressman Lawrence explained that the compilation in the "civil rights" area might have resulted in some minor "misconstruction" and errors "bordering on [new] legislation," but that the process was still "valuable in securing uniformity." Congressman Lawrence's remarks provide only the most oblique reference to the large expansion in the criminal law that the codification had in fact created:

> In the revision of seventeen volumes there will undoubtedly be not only erroneous punctuation but some omissions of provisions of laws in force; *some misconstruction of statutes carried into the new phraseology adopted;* some provisions of laws put down as in force which may have been repealed, and some other errors occur which will escape all the care, vigilance, and scrutiny that have been or can be given to the revision....
>
> ....
>
> The plan adopted is to collate in one title of "civil rights" the statutes which declare them, which point out the remedies to be pursued, in the manner required in judiciary and procedure statutes; and to insert under the title of "crimes" and under the subdivision chapter of "crimes against the elective franchise and civil rights" the penal provisions of the civil rights acts.
>
> ....
>
> A reference to this will indicate the manner in which the purposes of the several civil-rights statutes have been translated into the compiler, *and possibly may show verbal modifications bordering on legislation.*

[The Congressman then read from the Civil Rights Act of 1866 and 1870, the Fourteenth Amendment, and the 1871 Ku Klux Act, and continued:]

Mr. Durant, in his Revision of General Laws, ... condenses into one the three *criminal* sections I have cited from the acts....[6]

> While the three acts contain each a *criminal* section differing in words each from the other, and each section covering some crimes perhaps not covered by either of the others, the one consolidated section of Durant is made applicable to the violations of rights alike in the three acts. It

---

4. [S]ection 1 ... That any person who under color of any law ... of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, *shall ... be liable to the party injured, in any action at law, suit in equity, or other proper proceeding for redress....*
*Id.* at 828 (citing 17 Stat. 13 (1871)) (emphasis added).
The Ku Klux Act provided for both civil and criminal liability. Section 1, however, was purely civil, and provided an action for individuals to get either damages or injunctions against those who deprived them of their civil rights. The criminal provision of the 1871 Act is Section 2, which is the predecessor of current § 241. The compiler mistakenly used language from the civil section of the 1871 Act and created a statute like the civil statute, tied simply to "constitutional rights" and not limited to any specific conduct.

5. Another portion of the Ku Klux Act of 1871 provided for criminal penalties for conspiracies to violate constitutional rights, and became the basis for the modern day 18 U.S.C. § 241. This act was directed primarily at the Ku Klux Klan, and did not include the requirement that the violation occur under color of law. It criminalizes a conspiracy in which "two or more persons go in disguise upon the [public] highway" to hinder the exercise of a constitutional right. 18 U.S.C. § 241 (1988).

6. This is a serious mistake. The section quoted from the 1871 Act was civil only, and it was the broad language of the civil statute that was adopted as § 242.

requires great care to compare and examine the effect of all this, *and it is possible that the new consolidated section may operate differently from the three original sections in a very few cases. But the change, if any, cannot be objectionable, but is valuable as securing uniformity.*

2 Cong.Rec. 827–28 (1874) (emphasis added).

Contrary to the reference by Congressman Lawrence to possible "errors," "misconstruction" and minor changes "bordering on legislation," the Congressional leaders in both the House and the Senate flatly stated that the Durant codification would result in no changes to the laws. In the House, Congressman Poland, the manager of the bill, stated, "we purpose to present the law, when we have gone over it, as a reflex of existing statutes in force on the first day of this session [Dec. 1, 1873]."[7] Likewise, on the Senate floor during the course of a very short discussion of the new codification, Senator Conkling attempted to assure his colleagues that the revision did not represent a change in the law, but added the caveat—which turns out to be an understatement—that he had "no expectation that this work is free from error." 2 Cong.Rec. 4284 (1874).

▪ Accordingly, we can only conclude that, although members of Congress may have realized that in passing a large recodification of the existing body of federal law they might unwittingly be changing something, they had no actual knowledge that they were expanding criminal liability to cover violations of rights beyond certain enumerated rights, primarily those of contract, property, and equal protection. Congress does not evidence in § 242 a deliberate intent to create an evolving criminal law which expands to include new constitutional rights as they become a part of our civil constitutional law. Certainly Congress evidences no intent to make sexual or simple assault a constitutional crime under § 242. ˙Previously, Congress had provided liability for constitutional rights generally only by providing for civil liability.

Since 1874, Congress has not addressed the scope of the rights to be covered by the abstract language of § 242. The Supreme Court has once in passing recognized that "[t]he substantial change thus effected [to § 242] was made with the customary stout assertions of the codifiers that they had merely clarified and reorganized without changing substance." *United States v. Price,* 383 U.S. 787, 803, 86 S.Ct. 1152, 1161, 16 L.Ed.2d 267 (1966). This neglected and confused episode in the early history of civil rights legislation indicates that the 1874 Congress never deliberately intended to criminalize in § 242 the greatly expanded scope of modern-day constitutional rights even though the literal language of the statute—recodified from a previous civil statute by mistake—is open to that interpretation. Thus our reading of the legislative record does not support the extension of the abstract language of § 242 to cover all newly-created constitutional rights. Congress has deliberately provided only federal civil liability in such cases.

## III.  ANALYSIS

### A.  Case Law on Sexual Assault as a Constitutional Crime

Government counsel in their briefs and at oral argument recognized that in order to sustain the indictment here they must more

---

**7.** The following passages are excerpts of Congressman Poland's statements to the House assuring other representatives that the recodification would not change the law.

> Mr. Wood: If the gentleman from Vermont would permit me, I would like to ask him a question.
>
> . . . .
>
> It is, whether there will be anything in this revision of the laws that we have not already in the Statutes at Large?
> Mr. Poland: Nothing; At least we do not intend there shall be.

2 Cong.Rec. 129 (1873).

Later, Mr. Poland again made it clear that no substantive changes were intended:

> Mr. Poland: As I have already said, the commissioners have made some changes in the law, as they were authorized to do under the law. Mr. Durant [the compiler] was employed by the sub-committee of the House ... to go over this work and strike out everything in the nature of a change of the law. We purpose to present the law, when we have gone over it, as a reflex of existing statutes in force on the first day of this session [Dec. 1, 1873].

2 Cong.Rec. 648 (1874).

specifically define the theory behind the "constitutional right" that has been "deprived" under § 242. They recognize that it would not be sufficient simply to point to bad behavior by a state employee or official criminalized under state law. They also recognize that assault and battery and rape are state law crimes and that the Supreme Court has not held or implied that simple or sexual assault by state officials constitutes a constitutional tort under § 1983 or a constitutional crime under § 242.

Counsel argue at an extremely high level of generality. They assert that the constitutional right at issue is one of substantive due process. Their constitutional argument is that "freedom from sexual assault" is a part of a general constitutional right against interference with "bodily integrity" in a way that "shocks the conscience." They construct a constitutional right against sexual assault from language taken from two cases, *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), and *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

Counsel, like our dissenting colleagues, do not cite a Supreme Court opinion enforcing such a right. Instead, counsel construct the right from language in *Ingraham*, in which the Court said that schools must afford rudimentary procedural due process to children before paddling them but that such punishment is not subject to the Eighth Amendment. 430 U.S. at 671, 97 S.Ct. at 1412. In dicta, the Court mentioned that the Due Process Clause protects a person from "unjustified intrusions on personal security." *Ingraham*, 430 U.S. at 673, 97 S.Ct. at 1413.

To bolster their constitutional theory, government counsel then cite several lower court decisions in civil cases decided under § 1983. These are civil cases which created a general constitutional right to be free from sexual harassment and coercion. All of these civil decisions, rather than pointing to precedent establishing the right, make assertions such as: "surely the Constitution protects a schoolchild from physical sexual abuse ... by a public schoolteacher," *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451 (5th Cir. 1994) (en banc); or "the notion that individu-als have a fundamental substantive due process right to bodily integrity is beyond debate," *Walton v. Alexander*, 44 F.3d 1297, 1306 (5th Cir.1995) (Parker, J., concurring). These broad statements are not supported by precedent indicating that a general constitutional right to be free from sexual assault is part of a more abstract general right to "bodily integrity."

The prosecutors cite only one criminal case in which a lower court affirmed a § 242 conviction involving the deprivation of constitutional rights through sexual assault. In *United States v. Davila*, two border patrol officers conditioned entry into the United States upon receipt of sexual favors. 704 F.2d 749 (5th Cir.1983). In that case, the defendants did not challenge the extension of § 242 to sex crimes. The opinion addresses only evidentiary and other procedural issues. The *Davila* case does not decide or address the issue before us.

In *Cruzan v. Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), and *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), neither of which are cited by government counsel, the Court mentions "bodily integrity" as a significant value. *Cruzan* discussed bodily integrity in the context of an individual's decision to terminate life support. Similarly, in *Casey*, the Court recognized that the right to an abortion was related to "bodily integrity." Neither case dealt with an assault, and neither supports the Government's contention that the state right to be free from rape and sexual assault and harassment has also been recognized by the Supreme Court generally as a component of an enforceable general constitutional right to "bodily integrity."

The fact that government counsel find it necessary to limit the general constitutional right of "freedom from sexual assault" to conduct that "shocks the conscience" illustrates the weakness of their constitutional theory. In line with this theory, the district court below instructed the jury to convict the defendant only if the sexual assaults in this case were so severe that they "shock the conscience" of the jury.

Conditioning the right on whether the particular acts of a defendant "shock the conscience" leaves the definition of the crime up in the air.[8] The "shocks the conscience" language comes from *Rochin,* a case holding that pumping a suspect's stomach for drugs "shocked the conscience" and therefore violated his due process rights. 342 U.S. at 172, 72 S.Ct. at 209. But the Court intended the standard to be one of law, to be interpreted and applied by judges, not an element of a criminal offense. *Id.* at 170, 72 S.Ct. at 208. When a jury is asked to make a factual determination of whether a particular act "shocks the conscience," the instruction requires them to make an essentially arbitrary judgment. "Shocks the conscience" is too indefinite to give notice of a crime. The language as applied in different cases will yield results that depend too heavily on factual particularity of an individual set of events and upon biases and opinions of individual jurors. Counsel for the defendant observes in his *en banc* brief that the consequences of adopting such an argument generally to extend § 242 to sex crimes leaves the statute open-ended:

> The Congressional intent to punish corruptions and distortions of a lawful state process by state officials will be displaced by a judicially-created rule of criminal liability, applicable to physical assaults committed by state officials which a particular jury finds "shocking." Such a drastic expansion of this criminal statute is not only a judicial encroachment upon legislative authority, it is also an unwarranted encroachment of federal law enforcement authority into the ambit of state law enforcement.

Further Supplement to Defendant's En Banc Brief at 5, *United States v. Lanier* (No. 93–5608) (May 5, 1995).

## B. Canons of Interpretation of Criminal Statutes

In *Connally v. General Construction Co.,* the Court said that "the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties...." 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This language from *Connally* follows the three general canons that govern judicial construction of criminal statutes set out 175 years ago by Chief Justice Marshall in *United States v. Wiltberger,* 18 U.S. 76, 93, 5 Wheat. 35, 43, 5 L.Ed. 37 (1820), quoted earlier: (1) the legislature, not the judiciary, is the primary lawmaking body in the field of federal criminal law and must give the courts something definite to construe; (2) the "rule of lenity" provides that ambiguous criminal statutes should be construed in favor of the defendant; (3) the corollary that criminal statutes are normally strictly construed by the courts.

Chief Justice Marshall held that Congress has the sole responsibility to draft criminal statutes. It is the only branch of government with the authority to create new crimes. As he observed, "the power of punishment is vested in the legislature, not the judicial department. It is the legislature, not the court, which is to define a crime and ordain its punishment." 18 U.S. at 93. This is an articulation of a basic principle of the separation of powers, as well as due process. The theory is that behavior should only be criminalized if the democratic will so ordains. Unelected judges do not have the authority to enact new criminal laws.[9]

---

**8.** The dissenting opinions of Judges Wellford and Nelson also note the difficulty of applying this amorphous standard, but their solution is to concur in dismissing only the five misdemeanor counts. This solution is incommensurate with the problem because they fail to follow their own rationale by applying it to the two felony counts as well. They fail to recognize that the legislative choice in labelling sexual misconduct a misdemeanor instead of a felony provides no coherent principle for deciding whether conduct in question is a constitutional crime under § 242.

**9.** None of the dissenting opinions even mentions the basic point that unelected judges do not have the authority to enact new criminal laws or expand old ones to include new crimes. They do not recognize that each day at all levels of government, legislators, judges, administrators, prosecutors, police officers, school teachers and coaches, public health and hospital doctors, nurses and employees, military officers, tax collectors and many others interfere, sometimes unreasonably (often arguably maliciously and "shockingly"), with the property rights, personal liberty and bodily integrity of individuals in our

The Supreme Court has explicitly asserted this principle on a number of occasions. In *Bouie v. City of Columbia,* the Court reversed a conviction sustained by the South Carolina Supreme Court. 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). The state courts had convicted protestors of a criminal trespass under a novel interpretation of a state trespass statute. The court decision had the effect of creating a new crime. In *Bouie,* the Supreme Court condemned the attempt to use a judicial construction to achieve an "ex post facto effect" and concluded that such an extension of a criminal statute violated *Wiltberger. Id.* at 362, 84 S.Ct. at 1707.[10] *See also Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1002, 108 L.Ed.2d 132 (1990) ("legislatures, not courts, define criminal liability").

Similarly, turning assault and battery into a constitutional crime would violate the *Wiltberger–Bouie* principle by judicially creating a new crime under § 242. To do so would subject the defendant to the "ex post facto effect" rejected in *Bouie.*

■ In *Wiltberger,* Chief Justice Marshall also relied on the rule of lenity which mandates that in the case of an ambiguous criminal statute, the ambiguity should be resolved in favor of the defendant. The underlying reason for the rule is that the judiciary should not criminalize behavior that Congress may or may not have intended to prohibit by federal law, particularly when the conduct violates state law and comes within a traditional area of state police power. Of course, courts should not go to extreme lengths to characterize criminal statutes as ambiguous when they can be read as relatively well-defined. The courts should adopt a construction that gives a defendant the benefit of ambiguities, if any, but which also gives effect to the attempts of legislatures to address a particular problem. As Marshall wrote in 1820, "where there is no ambiguity in the words, there is no room for construction," *Wiltberger,* 18 U.S. at 95–96.

■ The final and most general principle enunciated in *Wiltberger* —that criminal statutes normally should be construed strictly— can be traced back to *Heydon's Cace,* 76 Eng.Rep. 637 (1584), in which Chief Justice Coke referred to the principle to limit the reach of a broad statute.[11] In *Wiltberger,* Chief Justice Marshall wrote that

> In the last analysis the case is controlled, we think, by the principle which Chief Justice Marshall stated for the Court in *United States v. Wiltberger,* 5 Wheat. 76, 96 [5 L.Ed. 37]: "The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated. ..." The crime for which these petitioners stand convicted was "not enumerated in the statute" at the time of their conduct. It follows that they have been deprived of liberty and property without due process of law in contravention of the Fourteenth Amendment.
> 378 U.S. at 362–63, 84 S.Ct. at 1707.

---

society. The open-ended expansion of criminal liability under § 242 by our dissenting colleagues to include any sort of deprivation of a liberty or property interest, or bodily integrity, would presumably turn each such wrong by one of these millions of public actors into a federal constitutional crime. Any rational discussion of the issue must come to grips with this problem.

**10.** The *Bouie* opinion concludes as follows:

We think it clear that the South Carolina Supreme Court, in applying its new construction of the statute to affirm these convictions, has deprived petitioners of rights guaranteed to them by the Due Process Clause. If South Carolina had applied to this case its new statute prohibiting the act of remaining on the premises of another after being asked to leave, the constitutional proscription of *ex post facto* laws would clearly invalidate the convictions. The Due Process Clause compels the same result here, where the State has sought to achieve precisely the same effect by judicial construction of the statute. While such a construction is of course valid for the future, it may not be applied retroactively, any more than a legislative enactment may be, to impose criminal penalties for conduct committed at a time when it was not fairly stated· to be criminal. ...

**11.** For a discussion of the historical development of this canon, see Max Radin, *A Short Way With Statutes,* 56 Harv.L.Rev. 388, 389 (1942).

the rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals.... To determine that a case is within the intention of the statute, its language must authorize us to say so.

18 U.S. at 95–96. In addition, Chief Justice Marshall said in language equally applicable to the case before us:

It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated.

*Id.* at 96.

Since *Wiltberger,* the Supreme Court, and the federal courts generally, have repeatedly reaffirmed this canon of construction. *Commissioner v. Acker,* 361 U.S. 87, 91, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959) ("The law is settled that 'penal statutes are to be strictly construed.'") (citations omitted). The *Wiltberger* language is frequently quoted, *see Moskal v. United States,* 498 U.S. 103, 132, 111 S.Ct. 461, 477, 112 L.Ed.2d 449 (1990) ("The temptation to stretch the law to fit the evil is an ancient one, and it must be resisted.") (Scalia, J., dissenting).

A holding here that the defendant is criminally liable under federal law would succumb to the temptation that Chief Justice Marshall warned against. The law would be punishing the defendant for committing a series of repugnant acts that may be of "equal atrocity, or kindred character" with crimes punishable under the statute, but no language of the statute and no holding of the Supreme Court suggest that such behavior constitutes a federal constitutional crime. There has been no notice to the public of such a federal crime. To hold otherwise would violate the Rule of Law as it has developed in criminal cases from the time of Chief Justice Marshall.

### C. The *Screws* Case Interpreted

*Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), as the three dissenters (Justices Jackson, Frankfurter, and Roberts) in that case repeatedly pointed out, diverges in part from these well established canons of construction of criminal law:

It was settled early in our history that prosecutions in the federal courts could not be founded on any undefined body of so-called common law. *United States v. Hudson,* 7 Cranch 32 [3 L.Ed. 259]; *United States v. Gooding,* 12 Wheat. 460 [6 L.Ed. 693]. Federal prosecutions must be founded on delineation by Congress of what is made criminal. To base federal prosecutions on the shifting and indeterminate decisions of courts is to sanction prosecutions for crimes based on definitions made by courts. This is tantamount to creating a new body of federal criminal common law.

It cannot be too often emphasized that as basic a difference as any between our notions of law and those of legal systems not founded on Anglo–American conceptions of liberty is that crimes must be defined by the legislature.

*Id.* at 152, 65 S.Ct. at 1059 (citation omitted).

Although the majority sought to minimize the deviation from precedent, *Screws* is the only Supreme Court case in our legal history in which a majority of the Court seems willing to create a common law crime. (Justice Douglas wrote a plurality opinion in which Chief Justice Stone and Justices Black and Reed concurred while Justice Rutledge concurred separately.) In *Screws,* a Georgia sheriff and two other officers arrested a black man and brutally executed him without a trial or a hearing. The plurality opinion by Justice Douglas upheld the indictment under § 242 because they believed that (1) it fit within the specific original purpose of the act, *i.e.,* "in origin it was an antidiscrimination measure (as its language indicated), framed to protect Negroes in their newly won rights," *id.* at 98, 65 S.Ct. at 1034, and (2) the wrongful conduct fit within the specific original purpose of the right of procedural due process going back to the Magna Charta, *i.e.,* that punishment may not be imposed prior to a trial:

It is plain that basic to the concept of due process of law in a criminal case is a trial—a trial in a court of law, not a "trial

by ordeal."... Those who decide to take the law into their own hands and act as prosecutor, jury, judge, and executioner plainly act to deprive a prisoner of the trial which due process of law guarantees him. *Id.* at 106, 65 S.Ct. at 1038 (citation omitted). Throughout the opinion, the plurality refers to the wrong as racial discrimination in depriving the decedent of the classic constitutional "right to be tried by a court rather than by ordeal." *Id.* at 107, 65 S.Ct. at 1038.

■ In *Screws*, the plurality opinion expressly observed that the Court believed that it was pushed to the difficult choice between declaring § 242 unconstitutional and adopting a "saving construction" that would greatly narrow the statute to the deprivation of obvious, well-established and publicly known constitutional rights. ("Only if no construction can save the Act ... are we willing to reach that result.") *Id.* at 100, 65 S.Ct. at 1035. Justice Douglas expressed the view that the plurality wanted to "save" the statute by limiting it to constitutional rights that any reasonable person should know about. The plurality called its construction a "narrow construction" that preserves the principle of strict construction of criminal statutes, and "so construed has a narrower range in all its applications than if it were interpreted in the manner urged by the government." *Id.* at 105, 65 S.Ct. at 1037. This saving construction held that a criminal defendant could receive the required notice that a constitutional right existed (and therefore that its breach was a crime) from "the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Id.* at 104, 65 S.Ct. at 1037. It is this phrase, which includes rights enunciated by "decisions," that makes *Screws* unique among criminal law precedents. It is clear, however, that the *Screws* exception to the *Wiltberger–Connally–Bouie* principles must be confined (1) to cases under § 242 in which the constitutional right "deprived" is specifically stated in the Constitution itself (*e.g.,* unconstitutional searches or seizures) and understood by the literate public to be a well-settled *constitutional* right, and (2) to well-established procedural due process rights like the right to be tried before being punished by law enforcement officers.

■ The right deprived in the instant case—the right not to be assaulted—is a clear right under state law known to every reasonable person. The defendant certainly knew his conduct violated the law. But it is not publicly known or understood that this right rises to the level of a "constitutional right." It has not been declared as such by the Supreme Court. It is not a right listed in the Constitution, nor is it a well-established right of procedural due process like the right to be tried before being punished.

■ Lower court decisions are not sufficient to establish and make definite a particular constitutional crime so as to provide the constitutionally-required notice necessary to support an indictment under § 242. Only a decision of the Supreme Court establishing the constitutional crime under § 242 can provide such notice. To accept lower court authority would result routinely in making federal criminal liability under § 242 turn on new crimes recognized only by the circuit or district court where the defendant engaged in the conduct at issue. A crime recognized in the Sixth Circuit but not in the Eighth Circuit would mean that felonious conduct criminalized in Memphis would not be a federal crime across the river in Arkansas. Only a Supreme Court decision with nationwide application can identify and make specific a right that can result in § 242 liability. Although a rule permitting the Supreme Court to create a new crime obliquely in this way is an exception to the *Wiltberger–Bouie* canons, *Screws* does contain language that creates a narrow exception under § 242.

*Screws* limits the reach of § 242 to cases in which the Supreme Court itself for the nation as a whole has made a particular constitutional right sufficiently clear that a violation of that right constitutes a crime as well as a civil wrong. Moreover, in both cases since *Screws* in which it has addressed the scope of § 242, the Supreme Court has cited one of its own precedents as clearly enunciating the constitutional right violated. *See United States v. Price,* 383 U.S. 787, 793, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966) (citing *Screws* ); *Williams v. United States,* 341 U.S. 97, 101, 71 S.Ct. 576, 579, 95 L.Ed. 774

(1951) (citing *Chambers v. Florida*, 309 U.S. 227, 237, 60 S.Ct. 472, 477, 84 L.Ed. 716 (1940), and *Brown v. Mississippi*, 297 U.S. 278, 285–86, 56 S.Ct. 461, 464–65, 80 L.Ed. 682 (1936)). *Screws* does not extend § 242 to conduct not addressed in the statute, nor ever addressed by the Supreme Court.

■ In *Screws*, the Supreme Court reasoned that only its own opinions could provide sufficient notice under § 242 to make "specific" the constitutional right in question. 325 U.S. at 104, 65 S.Ct. at 1036–37. As we interpret the "make specific" requirement, the Supreme Court must not only enunciate the existence of a right, it must also hold that the right applies to a factual situation fundamentally similar to the one at bar. If the Court enunciates a right, but leaves some doubt or ambiguity as to whether that right will apply to a particular factual situation, the right has not been "made specific" as is required under *Screws* and under traditional canons of construction of criminal statutes.

■ The "make specific" standard is substantially higher than the "clearly established" standard used to judge qualified immunity in section 1983 civil cases. The Court normally reviews constitutional rights in the context of section 1983 cases. In those civil, constitutional tort cases, the parties accused of violating constitutional rights have the protection of the qualified immunity doctrine. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (the operation of qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified"). Government counsel do not admit the existence of such a "qualified immunity" defense in criminal cases. So interpreted, § 242 would mean that the criminal statute is much broader in scope than its civil counterpart. The government's theory of § 242 criminal liability would visit long crimi-

nal sentences on defendants who could successfully defend a constitutional tort case for damages on grounds that the federal constitutional law has not yet become "clearly established." Criminal liability would be much easier to establish for the same wrong than civil liability.

Civil law usually exacts less severe penalties, and consequently, the law allows for a more fluid interpretation in civil cases than in criminal cases. But here, according to the government, § 242 would be carried along on the currents of these civil law interpretations without the corresponding defenses allowed in civil damage cases.

Furthermore, unlike other criminal statutes, § 242 criminalizes violations of abstract rights at an extremely high level of generality and not particular conduct that may be illegal under state law. As the *Screws* plurality noted, murder and assault committed under color of law may or may not violate § 242 depending on whether other factors are present that raise the conduct to the level of a constitutional deprivation. *Screws*, 325 U.S. at 108–09, 65 S.Ct. at 1039 ("The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States."). For example, in *Screws*, the murder had to constitute a "trial by ordeal" to rise to the level of a procedural due process violation. In this case, we do not hold that simple or sexual assault may never violate § 242. For example, a sexual assault raising an equal protection gender discrimination claim may present an entirely different case.[12] We only conclude that sexual assaults may not be prosecuted as violations of a constitutional substantive due process right to bodily integrity, the only theory presented by government counsel. In doing so, we construe *Screws*

12. Our dissenting colleagues in their various opinions repeat the refrain that local prosecutors and law enforcement officials in West Tennessee are so corrupt that they would not prosecute a member of the Lanier family for sexual assault. For example, Judge Wellford states, "it was clear that Judge David W. Lanier was not going to be called into account for his misdeeds and judicial misconduct by local or county officials who had

been beholden to the longstanding sway of the Lanier dynasty." There is no factual basis in the record for such statements. There is no basis in the record for assuming anything other than that state and local officials cooperated in the investigation of the defendant in the normal way and then stepped aside when the federal prosecutor decided to take the case.

narrowly, as we normally construe criminal statutes.

As counsel for defendant argues, permitting federal prosecutions for "conscience shocking" simple and sexual assaults committed by federal, state and local employees or officials places unparalleled, unprecedented discretion in the hands of federal law enforcement officers, prosecutors and judges. In the absence of any definition or limitations on the extent of the crime—and given that such prosecutions are useful political weapons—permitting such discretion is a particular risk for due process. Many public officials and employees have recently been accused of similar deviant conduct, but no other case has been prosecuted. Such an unprecedented, selective application of the statute in this case was possible only by giving the broadest possible construction to the most ambiguous of federal criminal statutes. The indictment in this case for a previously unknown, undeclared and undefined constitutional crime cannot be allowed to stand. Accordingly, the judgment of the court below is reversed and the Court is instructed to dismiss the indictment.[13]

WELLFORD, Circuit Judge, concurring in part and dissenting in part.

To the extent that the majority has set aside the convictions of this state judge on five misdemeanor counts for sexual assault, without any resulting serious bodily injury to the victims, I concur in the result reached, although I do not agree with the majority decisions's rationale. I do so in order that 18 U.S.C. § 242, a venerable criminal statute that was originally designed to protect the rights of those recently freed from the bonds of slavery, not be trivialized. It is simply better to recognize that immoral, abusive conduct of a state judge should not be prosecuted in federal court if that deplorable conduct amounts to nothing beyond a state misdemeanor offense.

I dissent from the reversal of the convictions for the two felony offenses that I believe fall within the spirit and the meaning of 18 U.S.C. § 242. I agree with and adopt the separate dissenting opinion of Judge Daughtrey in this regard. I recognize that this is a difficult case, the first of its kind in our court (fortunately), and perhaps the first of this type against a state judge in any federal court. Further, I do not concur in the majority's condemnation of the prosecution for bringing the charges against a defendant who possessed great political and judicial power in his community and who abused that power shamelessly against those who came within the grasp of his authority.

The fundamental question in this case is whether gross abuse of state authority and state law (and custom) by a state actor amounts to deprivation of rights protected by the Constitution and laws of the United States. This defendant and his family have occupied positions of power and political authority in Dyersburg, Dyer County, Tennessee, for several generations. It was clear that Judge David W. Lanier was not going to be called into account for his misdeeds and judicial misconduct by local or county officeholders who had been beholden to the long-standing sway of the Lanier dynasty. The bringing of this indictment and the pursuit of a trial against Lanier was not, however, a political maneuver, nor was it an effort to impose federal will and law upon an opponent. It was not in any sense a "useful political weapon," but it was instituted to set a new precedent if Lanier were to be prosecuted at all.

---

**13.** This appeal has produced five separate opinions, passionately and in some passages eloquently stated, in addition to the Court's opinion for nine judges. Allowing the defendant who is guilty of reprehensible conduct to go free is not a satisfying result, but it is the result required by longstanding principles of federalism, separation of judicial and legislative powers and the right to formal public notice when new crimes are enacted. It should be noted also that the defendant's conduct has not remained unnoticed. He has lost his robes, his income and his reputation. He was incarcerated for two years in federal prison pending appeal and will remain subject to prosecution in state court for many years to come. Tenn.Code Ann. §§ 39–13–502 through 506 (Supp.1995) defines the crimes of "Aggravated Rape," "Rape," "Aggravated Sexual Battery" and "Sexual Battery" and §§ 40–2–101 provides statute of limitations periods of 15, 8, 8 and 2 years respectively for these crimes.

The felony offenses, of which David Lanier was determined to be guilty by a court and jury, was expressly found to be shocking to the conscience of the court. As stated by the majority, the two felony counts charged "coercive sexual acts," which were found to be deprivations of liberty without due process of law by willful conduct of the defendant "using his official position as a [state] Chancellor."

The Supreme Court in *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), as was rather grudgingly conceded by the majority, did uphold the constitutionality of 18 U.S.C. § 242 in the face of a challenge similar in many respects to that expressed by the majority and by the defendant himself. The objections expressed by Chief Judge Merritt are essentially that this statute was "too indefinite and too vague to meet due process standards." The crime in *Screws* involved a major state felony offense which deprived the victim under color of law "of certain constitutional rights guaranteed to him." *Screws*, 325 U.S. at 94, 65 S.Ct. at 1032. The defendant in *Screws* claimed, as does Lanier, that there was no noticed, determinable "standard of guilt" set out in 18 U.S.C. § 242. *Id.* at 95, 65 S.Ct. at 1032.

Quoting *Betts v. Brady*, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942), however, the Court in *Screws* upheld a then novel application of § 242:

> The phrase [due process] formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, *shocking to the universal sense of justice*, may, in other circumstances, and in the light of other considerations, fall short of such denial.

*Id.* (emphasis added).

In upholding the constitutionality of the Act, the Court concluded:

We hesitate to say that when Congress sought to enforce the Fourteenth Amendment in this fashion it did a vain thing. We hesitate to conclude that for 80 years this effort of Congress, renewed several times, to protect the important rights of the individual guaranteed by the Fourteenth Amendment has been an idle gesture. Yet if the Act falls by reason of vagueness so far as due process of law is concerned, there would seem to be a similar lack of specificity when the privileges and immunities clause (*Madden v. Kentucky*, 309 U.S. 83 [60 S.Ct. 406, 84 L.Ed. 590]) and the equal protection clause (*Smith v. Texas*, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84]) of the Fourteenth Amendment are involved.

. . .

We do say that a requirement of a specific intent to deprive a person of a federal right made definite by decision or other rule of law saves the Act from any charge of unconstitutionality on the grounds of vagueness.

*Id.* at 100, 103, 65 S.Ct. at 1035, 1036 (footnote omitted).

In addition, *Screws* established the principle that a defendant charged with a violation of § 242 is not saved or excused by any claim that, when doing the assaultive acts, was not "thinking in constitutional terms;" when, however, his "aim was ... to deprive a citizen of a right ... protected by the Constitution." *Id.* at 106, 65 S.Ct. at 1037–38. The emphasis in *Screws*, as in *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), and in this case, was upon the misuse of official state powers to the injury of a citizen who was subject to the officer's authority or control. Justice Rutledge described the criminal action as a "gross abuse of authority." *Screws*, 325 U.S. at 113, 65 S.Ct. at 1041 (concurring opinion).[1] He further observed in note 5 that "[i]t does not appear that the state has taken any steps toward prosecution for violation of its law."

---

**1.** The majority discusses, and disagrees with, the decision in *Screws* by its "interpretation" that it "diverges ... from ... well established canons of criminal law." There is no discussion, however, of *Classic*, cited as precedential authority in *Screws*.

Neither has Tennessee prosecuted Lanier in the instant case.[2]

As noted by Justice Rutledge in *Screws, Classic* analyzed a number of cases which "sustained [the statute] in application to a vast range of rights secured by the Constitution." *Id.* at 121–22, 65 S.Ct. at 1045. Justice Rutledge also answered another objection made in this case: "the generality of the section's terms simply has not worked out to be a hazard of constitutional, or even serious, proportions.... Generally state officials know something of the individual's basic legal rights. If they do not, they should." *Id.* at 128, 129, 65 S.Ct. at 1048, 1049.

Our court has recently recognized:

"[O]nce a due process right has been defined and made specific by court decisions, that right is encompassed by § 242." *United States v. Stokes,* 506 F.2d 771, 774–75 (5th Cir.1975) (citing *Screws*). Courts have applied § 242 to punish police officers who have abused their authority under "color of law."

*United States v. Epley,* 52 F.3d 571, 576 (6th Cir.1995). In *Epley,* the constitutional right at issue was "[the] right to be free from 'seizure' without probable cause." *Id.* In my view, the right to be free of sexual assault is akin to the constitutional right recognized in *Epley.* In addition, other courts have recognized that "the Supreme Court seldom voids federal statutes on vagueness grounds." *Columbia Natural Resources v. Tatum,* 58 F.3d 1101, 1108 (6th Cir.1995). The *Tatum* court inferred that the court would set aside a federal statue, such as § 242, only if "no standard of conduct is specified at all." *Id.* (quoting *United States v. Angiulo,* 897 F.2d 1169, 1179 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990)). That Congress might "have chosen 'clearer and more precise language'" in § 242 is not sufficient to make out a vagueness challenge. *See United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975) (quoting *United States v. Petrillo,* 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947)).

The Supreme Court has recognized that persons, especially females, have a constitutional right to bodily integrity. *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *see also Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Such a right from physical and sexual assault under 42 U.S.C. § 1983 was recognized in *Doe v. Taylor Independent School Dist.,* 15 F.3d 443 (5th Cir.) (en banc), *cert. denied sub nom.,* —— U.S. ——, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994).

If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical abuse—here, sexually fondling a 15-year old school girl and statutory rape.... It is uncontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives that child of rights vouchsafed by the Fourteenth Amendment.

*Id.* at 451.

Other federal cases have enforced 18 U.S.C. § 242 in the context of state officers sexually assaulting or abusing their authority to demand sexual favors. *See United States v. Contreras,* 950 F.2d 232 (5th Cir.1991), *cert. denied,* 504 U.S. 941, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992) (affirming conviction of police officer under 18 U.S.C. § 242 for sexually assaulting illegal immigrant in patrol car and attempting to kill her to prevent her from testifying); *United States v. Davila,* 704 F.2d 749 (5th Cir.1983) (affirming conviction of border patrols under 18 U.S.C. § 242 for depriving illegal aliens of their liberty by coercing sexual favors from them). Many other cases have involved charges brought against state officials for physical assaults and other types of misuse of their power and authority. *See United States v. Brummett,* 786 F.2d 720 (6th Cir.1986) (affirming conviction of jail officials under 18 U.S.C. § 242 for having inmates beat another prisoner); *United States v. Dise,* 763 F.2d 586 (3d Cir.)

---

**2.** In footnote 12, the majority assumes that state and local officials were cooperating in the federal prosecution. There is no question but that neither has taken any steps to prosecute Lanier on any basis during the *six years* since some of his offenses occurred in Dyer County, Tennessee.

(affirming conviction of mental health worker under 18 U.S.C. § 242 for beating psychiatric patients), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985); *United States v. Stokes,* 506 F.2d 771 (5th Cir.1975) (police officer convicted under 18 U.S.C. § 242 for beating prisoner); *United States v. Occhipinti,* 772 F.Supp. 170 (S.D.N.Y.1991), *aff'd,* 969 F.2d 1042 (2d Cir.1992) (INS officer convicted under 18 U.S.C. § 242 for violating suspect's rights to be free from unlawful search and seizure).[3]

The district judge in this case instructed the jury that to convict the defendant the jurors had to find him guilty of physically abusive and unconstitutional conduct "of a serious and substantial nature" involving "physical force, mental coercion, bodily injury or emotional damage which is shocking to one's conscience." These were serious charges, far beyond mere sexual harassment or employment discrimination. Despite the fact that this prosecution was a first, and the substantial reservations that I share about expansion or intrusion of federal authority, I would affirm Lanier's felony convictions under all the circumstances.

I would also find Lanier's actions here to constitute an official abuse of power under color of state law, not mere personal pursuits as he has claimed. In this respect, I quote from Judge Milburn's earlier opinion (now vacated) discussing this aspect of the case:

Defendant argues that his actions in this case were personal pursuits. However, the jury correctly concluded that defendant's actions in this case were taken under color of state law. First, all of the assaults took place in defendant's chambers during working hours, and during each assault there was at least an aura of official authority and power. Three of the victims, Sandy Sanders, Patty Mahoney, and Sandy Attaway, were present in defendant's chambers because they were working for him. On the first occasion Vivian Archie was assaulted, she had gone to defendant's chambers to apply for a secretarial position. On the second occasion

Archie was assaulted, defendant used his continuing authority to determine custody of her child to coerce her into returning to his office. Finally, Fonda Bandy was assaulted while she was present in defendant's chambers to make a presentation about her parenting classes for juvenile offenders.

Further, there was evidence that defendant used his position to intimidate his victims into silence. Prior to the first assault, defendant told Archie that her father wanted to know how he could go about seeking custody of her child. Defendant was also able to coerce Archie back into his office a second time because he knew she needed a job in order to ensure that she would keep custody of her child.

. . .

Furthermore, we wish to emphasize that his case involves much more than a defendant who is a mere public official. Rather, this case involves a state judge who committed various abhorrent and unlawful sexual acts in his chambers, oftentimes while wearing his judicial robe. We consider such egregious misconduct on the part of defendant to be shocking to the conscience of the court.

*United States v. Lanier,* 33 F.3d 639, 653 (6th Cir.1994), *vacated,* 43 F.3d 1033 (1995).

Accordingly, I **DISSENT** from the majority's reversal of the felony convictions in this case.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I do not question the validity of the general principles set forth in the majority opinion, and I agree with the majority's application of those principles to defendant Lanier's misdemeanor convictions. It does not seem to me that the women who were on the receiving end of the various "touchings" and "grabbings" described in the pertinent misdemeanor counts of the indictment were deprived of their "liberty" in the sense in which that term is used in the Fourteenth Amendment.

---

**3.** I recognize that the absence of custody in the instant case makes it distinguishable from the above-cited § 242 criminal proceedings.

Whether or not the oafish behavior described in these misdemeanor counts was enough to shock the conscience, therefore, I do not believe that such behavior was criminalized by 18 U.S.C. § 242.[1] I question, moreover, whether the jury could properly have found all of the touchings and grabbings in question to have been engaged in "under color of any law...."

The acts that the jury found to be felonious, however, could well be found to have been committed under color of law, in my view—and the victim of those acts was so clearly deprived of her liberty, as I see it, that the applicability of the statute strikes me as self-evident.[2] The theory of the felony counts was that the defendant willfully—and repeatedly—used the powers of his judicial office to coerce a woman named Vivian Archie into fellating him on pain of losing her child. Mrs. Archie was physically restrained throughout these assaults, according to her testimony, and she was afraid to scream for help because of the defendant's implied threats to deprive her of the custody of her little girl. The jury evidently thought that Mrs. Archie was telling the truth—and if the jury was right in this, it is hard for me to imagine a more clear-cut deprivation of liberty.

We need not rely on emanations from the penumbras of *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), to reach the conclusion that Mrs. Archie was willfully deprived of a constitu-

tional right—and I confess myself somewhat mystified by the majority's insistence that the right in question was a "newly-created" one. From the day it was adopted in 1868, the Fourteenth Amendment has prohibited the states from depriving any person of liberty without due process of law. Section 242 has long put the literate public on notice that any willful violation of this prohibition, if committed under color of law, is a crime. There is nothing ambiguous, abstract, or unclear about the statute in this respect, and at no point during the course of his trial did it occur to the defendant to claim otherwise.

If the jury got its facts right, Vivian Archie was literally (and humiliatingly) deprived of her liberty while locked in the defendant's foul embraces. We must take it as given that Mrs. Archie was restrained not only by the defendant's hands on her throat, but by the defendant's none-too-subtle suggestion that her daughter would be taken away from her if she resisted. On these facts, I simply cannot believe that the statesmen who framed the Fourteenth Amendment, or the Congress that enacted Section 242 in 1874, would have had any doubt that the defendant's conduct was unconstitutional.

Although it was not a constitutional case, *Union Pacific Ry. Co. v. Botsford,* 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), may serve to remind us of the sensibilities of the age in which the provisions at issue here were adopted. The plaintiff in *Botsford* was

---

**1.** The Supreme Court has rejected the "shock the conscience" test for excessive use of force by the police, *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and *Graham* left it uncertain to what extent, if at all, this fuzzy test may be applicable in other contexts. See *Braley v. City of Pontiac,* 906 F.2d 220, 226 (6th Cir.1990). But see also *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), where the Court seemed to assume some continuing role for the test.

    With regard to n. 8 of the majority opinion, it is not the legislative labeling of the touchings and grabbings as misdemeanors that leads me to agree that they are not constitutional crimes under § 242. The touchings and grabbings are not constitutional crimes, in my view, because they do not clearly entail a deprivation of liberty.

**2.** One reading the statute without benefit of any judicial gloss might not think it self-evident that Section 242 criminalizes deprivations of consti-

tutional rights regardless of motive, as opposed to criminalizing deprivations committed on account of the victim's "being an alien, or by reason of his color, or race...." In *United States v. Classic,* 313 U.S. 299, 326–29, 61 S.Ct. 1031, 1043–44, 85 L.Ed. 1368 (1941), however, the Supreme Court squarely held that the quoted qualification applies only to the imposition of "different punishments, pains, or penalties," and does not apply to deprivations of constitutional rights generally. Under *Classic,* and under *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the rule seems to be that deprivation of any express constitutional right—including, of course, the right not to be deprived of life, liberty or property without due process of law—is criminalized by Section 242 if "willfully inflicted by those acting under color of any law, statute and the like." *Classic,* 313 U.S. at 329, 61 S.Ct. at 1044.

a woman who claimed to have been injured in an accident aboard a railway car. The defendant railway company moved for a court order requiring the plaintiff to submit to a surgical examination—to be conducted, the defendant was at pains to explain, "in [a] manner not to expose the person of the plaintiff in any indelicate manner...." Upholding a refusal by the trial court to order the examination, absent any statute authorizing it, the Supreme Court observed that:

> "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* at 251, 11 S.Ct. at 1001.

Vivian Archie, as the jury concluded in the case at bar, was deprived of the possession and control of her own person, and was subjected to the vilest sort of restraint and interference. Surely the *Botsford* court—a court that considered it "an indignity, an assault, and a trespass" for anyone, "especially a woman," to be compelled "to lay bare the body, or to submit it to the touch of a stranger," *id.* at 252, 11 S.Ct. at 1001—would have had some difficulty with the conclusion that a woman used in the way that the defendant apparently used Mrs. Archie was not deprived of her liberty.

It is true that the Supreme Court has not had occasion to decide explicitly whether Section 242 criminalizes a deprivation of liberty resulting from lust, but this does not suggest to me that lower courts are somehow estopped to apply Section 242 in this context. It would be passing strange, I think, if judges could acquire by prescription a right to make sex slaves of litigants or prospective litigants. And if the majority opinion is correct in the conclusion it draws from the absence of direct Supreme Court precedent, I am not sure that I understand how such a question could ever reach the Supreme Court in the first place.

It is also true that in recent years other public officials and employees may have engaged in deviant behavior similar to the defendant's without having been prosecuted. I do not recall any such person having been accused of forcing a woman to choose between her virtue and her child. But if other public officials have escaped prosecution for using the power of public office to subjugate women in the way defendant Lanier is supposed to have done, I question whether it follows that the prosecution of defendant Lanier was improper. Perhaps the impropriety lies in the failure to prosecute the others.

It might well have been preferable for defendant Lanier to be prosecuted in a state court. For reasons to which Judge Wellford has alluded, however, that was probably not likely to happen. In any event, ineffectiveness of state criminal process is no more an element of the federal offense with which the defendant was charged than ineffectiveness of state drug laws is an element of a federal drug case. I certainly do not fault the decision of the United States Attorney to present this case to a federal grand jury, and I know of absolutely nothing to suggest that the defendant was a victim of "selective" prosecution.

Concurring in the reversal of the misdemeanor convictions, and dissenting from the reversal of the felony convictions, I join in the opinions of Judges Wellford and Daughtrey insofar as those opinions are consistent with the views I have stated.

KEITH, Circuit Judge, joining in the dissent.

Today, the majority, in an opinion thoroughly lacking in indignation for the outrageous acts perpetrated by Judge Lanier, reverses Lanier's conviction under 42 U.S.C. § 242 on the grounds that § 242 does not expressly criminalize sexual assault committed against court employees and litigants by a state judge. I dissent for the reasons so eloquently stated by Judge Daughtrey. However, because I am deeply disturbed by not only the conclusion the majority has reached, but also by the insensitive tone and lack of compassion permeating the majority opinion, I add this additional comment.

In one of the most deplorable cases to come before this Court since I have served on the federal bench, the majority has done the public a great disservice. It is clear that

in a society that has historically oppressed women, abuse of power by a judicial officer appointed or elected to ensure fairness is truly devastating. It is undeniable that Judge Lanier wielded tremendous power and influence in the Dyersburg, Tennessee community. His power over his victims was augmented by his position as employer to some and in the case of Vivian Archie, by his control over the custody arrangements of Archie's child. The shocking sexual assaults, forced sex acts and threats with which Judge Lanier victimized women are reprehensible. In my view, Judge Lanier's loathsome acts, combined with the fact that he was found to have sexually assaulted one of his victims while wearing his judicial robes, are more than enough to satisfy the most stringent interpretations for prosecution under § 242.

However, incredibly, the majority ignores the facts and the law to hold that § 242 does not criminalize such behavior. In order to reach its preposterous result, the majority not only dismisses clearly established law protecting each person's right to be free from interference with bodily integrity that shocks the conscience, but also ignores the outrageous nature of Judge Lanier's actions. Besides glossing over the horrendous acts for which Lanier was convicted, the majority, in cavalier fashion, also devalues the fact that Lanier was tried and found guilty by a jury of his peers and was later sentenced to twenty-five years in prison. In consideration of the above, the majority's holding does nothing less than render Judge Lanier's egregious acts acceptable.

As judges, we are guardians and trustees of the justice system. At a time when lack of public confidence in the justice system is at it greatest, the majority reaches a result that is guaranteed to further lower the public's trust. In a country where the average person may go to jail for stealing a loaf of bread, the majority releases back into the community a judge who has used the power of his office and his position in society to repeatedly victimize women. If federal law is not to protect women from being forced to sexually gratify a judicial officer at his request under threats of losing their jobs or children, whom is it to protect? Certainly, it was not intended to protect judges who commit such outrageous acts. No person is above the law, especially a judge. It is my firm belief that for people to have faith in our system of justice, the grossly offensive acts Judge Lanier committed against women at his mercy cannot be sanctioned by this Court. Sadly, the majority seems to have forgotten that while law is a means, "[j]ustice is the end." *See* THE FEDERALIST No. 51 (James Madison) (Clinton Rossiter ed., 1961).[1] In this case, law has not served the ends of justice.

Accordingly, I join in Judge Daughtrey's dissent.

NATHANIEL R. JONES, Circuit Judge, dissenting.

One of the cardinal principles that guides my appellate review of criminal cases is to insure that outrage at the egregiousness of the complained of conduct has not intruded upon the application of neutral principles of law. Thus, in this case, the offensive and degrading conduct of Appellant Lanier prompted me to undertake a searching review of the record and legal precedents related to enforcement of various civil rights statutes. I candidly admit that my first reading of the majority opinion impressed me so greatly that I was forced to reexamine my initial decision to uphold the conviction.

A meticulous review of the record now assures me that the conviction in this case did not result in a criminalization of conduct based upon its outrageousness rather than its unconstitutionality. So assured, I dissent.

I can readily understand the result reached by the majority, given the premise from which it begins its analysis. However, my view of constitutional rights and of the evolvement principles, carries me to another analytical starting point. My belief is now clear that Lanier's actions against his victims transgressed their liberty interest enshrined in the constitution.

---

1. In *Federalist* paper No. 51, James Madison wrote: "Justice is the end of government. It is the end of civil society. It ever has been and ever will be pursued until it be obtained, or until liberty be lost in the pursuit."

For me to agree with the majority would require that I hold, even at this late date in our civil rights and human rights development, that section 242 should be limited to deprivation of the discrete categories of property, contract, and equal protection. The narrow reading applied by the majority would abandon the Supreme Court's opinion in *Screws v. United States*, which upholds section 242 as it applies to willful violations of any constitutional right that has been made specific. 325 U.S. 91, 104, 65 S.Ct. 1031, 1036–37, 89 L.Ed. 1495 (1945). Section 242 has proven to be a valuable tool in prosecuting willful violators of a number a constitutional rights. To list only a few, section 242 convictions have resulted from: violations of the Eighth Amendment right to be free from cruel and unusual punishment, *United States v. Tines, et al.,* 70 F.3d 891 (6th Cir.1995); *United States v. Georvassilis,* 498 F.2d 883 (6th Cir.1974); the Fourth Amendment right to be free from excessive force during detention, *United States v. Reese et al.,* 2 F.3d 870 (9th Cir.1993); the Fourteenth Amendment procedural due process right to a trial before conviction, *United States v. Cobb, et al.,* 905 F.2d 784 (4th Cir.1990). I note particularly that section 242 prosecutions have been brought for violations of Fourteenth Amendment substantive due process rights. In *United States v. O'Dell et al.,* 462 F.2d 224 (6th Cir.1972), this court affirmed a section 242 conviction for a violation of a pretrial detainee's substantive due process right to be free from excessive force amounting to punishment. I see no barrier to applying section 242 to violations of substantive due process rights just as it is applied to violations of other constitutional rights. The only hurdle is demonstrating that the right has been made specific by decisions of the courts of the United States.

Like Judge Daughtrey, I believe that court decisions have made specific the right to be free from invasions of bodily integrity that shock the conscience. In my dissent from the majority opinion in *Wilson v. Beebe,* I acknowledged a protected liberty interest in personal dignity and bodily integrity. 770 F.2d 578, 594 (6th Cir.1985) (Jones, J. dissenting). The complainant in *Wilson* sustained critical injuries after being shot by a police officer who attempted to handcuff him while holding his cocked service revolver in one of his hands. *Id.* As Judge Daughtrey has in this case, in *Wilson,* I drew from the Supreme Court's decision in *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), as the source of the liberty interest. I concur in Judge Daughtrey's discussion of the development and establishment of the right to bodily integrity and accordingly see no need to repeat the discussion in this separate opinion.

Moreover, I am not disturbed that the Supreme Court has not held specifically that sexual assault violates the right to bodily integrity. This reflects only the reality that a number of ways exist to deprive one of a right. Surely the majority would not suggest that a deprivation of property or contract would be any less a deprivation because it was accomplished by a means not previously addressed by the Supreme Court. If a right to bodily integrity includes freedom from corporal punishment, freedom to make reproductive decisions and freedom from unwanted medical intrusions, it must include protections from forced sexual advances. Further, as Judge Daughtrey points out, violations of bodily integrity by sexual assault have previously been the bases for convictions under section 242.

I must also dissent from the majority's rejection of the right to bodily integrity as grounds for a section 242 conviction because its bounds have been established in civil rather than criminal cases. Once established, a constitutional right is absolute. Of course, the degree of infringement necessary to support a suit may differ depending upon whether the suit is civil or criminal. I cannot, however, endorse a policy of denying the basic existence of a right in a criminal case because the courts have developed the right in civil rather than criminal cases. As stated by the Ninth Circuit:

There is nothing wrong with looking to a civil case brought under 42 U.S.C. § 1983 for guidance as to the nature of the constitutional right whose alleged violation has been made the basis of a section 242 charge. The protections of the Constitution do not change according to the proce-

dural context in which they are enforced— whether the allegation that constitutional rights have been transgressed is raised in a civil action or in a criminal prosecution, they are the same constitutional rights. *United States v. Reese,* 2 F.3d 870, 884 (9th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994). Likewise, in *United States v. Bigham,* the Fifth Circuit stated:

> Whether a case is brought on the civil or criminal side of the docket, the actionable conduct is deprivation of rights secured by the Constitution or laws of the United States. The culpable intent will vary from willfulness of a criminal charge to something less in a civil complaint, and it may vary according to the particular constitutional right infringed. Otherwise, between the criminal and civil statutes the courts recognize the intent of Congress to cover the same cases, though providing different remedies.

812 F.2d 943, 948 (5th Cir.1987) (citations omitted). Once a right has been made a definite and specific part of the body of Fourteenth Amendment due process rights, a willful violation of that right comes within the purview of section 242. *United States v. Stokes,* 506 F.2d 771, 776 (5th Cir.1975) (relying on both criminal and civil cases to hold the right to be free from injury while in police custody had been made specific). Even though the parameters of the right to bodily integrity have been forged primarily in civil cases, the right has been made specific nonetheless. Therefore, there should be no question that the violation of the right may serve as the basis of a prosecution under section 242.

I share the majority's view that the monstrous nature of a defendant's actions must not lead the courts to expand federal criminal statutes beyond their intended reach. Prin-

ciples of strict construction require this court not to do so. The Supreme Court, however, has approved, in this unique instance, a criminal statute that changes with the changing nature of due process rights. The Supreme Court recognized in *Screws* that not every law enforcement officer would be aware of the full range of rights that might be constitutional. For that reason, the Supreme Court limited the application to section 242 to rights made specific. *Screws,* 325 U.S. at 104, 65 S.Ct. at 1036–37. A criminal conviction based on a right not fully defined and developed by the courts would violate principles of notice and strict construction. Nevertheless, when the courts fully define the parameters of the right, notice has been given that violation of such a right may result in a criminal conviction.

Some of my colleagues apparently and understandably fear that a criminal statute cannot cross reference a series of rights that may be ever changing. However, the nature of the substantive due process right is to change to protect that values of our times. Without elastic principles of due process, many of our greatest civil rights challenges could not have been overcome. Although appealing on one level, I have concluded that worries that 242 will provide an impermissibly flexible body of criminal law are not well founded. The Supreme Court built safeguards into the statute by requiring the specific establishment of rights and by requiring willful violations. Without the establishment of a right by the courts, there is no danger that runaway or other opportunistic prosecutors will break open the bounds of the statute with crimes that were never meant to be encompassed by its reach. Courts are entrusted with the duty to decide when a right is constitutional. Only after this decision has been made are prosecutors afforded the opportunity to bring indictments.[1]

---

1. In its footnote 9, the majority expresses its belief that the dissenters somehow have not contemplated the effect that holding violations of bodily integrity are within the reach of section 242. By listing the number of potential violators, the majority seems to reason that because a wide range of government employees may regularly violate citizens' bodily integrity, section 242 cannot be used to criminalize such viola-

tions. The majority's statement lacks the support of logic. The number of violators should not determine whether an action is criminal. It is unlikely that the majority would decline to affirm section 242 violations of Fourth or Eighth Amendment rights merely because many police officers around the country beat and abuse inmates on a regular basis. If the number of conscience shocking violations occurring regu-

Again, I note my agreement with the principles behind the majority's push to limit the application of section 242. Without legislative action, the criminal law generally cannot be freely expanded to meet the outrage of an angry community. Such elasticity in the law would make potential defendants of those whose actions disturb a particular prosecutor or community but not the populace at large. Minorities, who have traditionally suffered the most injustice at the hands of our criminal law, would be especially vulnerable to a criminal law that makes unpopular actions criminal without endorsement of the legislature and without notice to the potential violator. I am comfortable with the elasticity of section 242 only because its growth is checked by its link to our Constitution. I am secure in my knowledge the link between the statute and the Constitution will prevent section 242 from being used as a tool to prosecute those whose actions are merely unpopular in a particular community. The disgusting and reprehensible conduct of Appellant Lanier sinks far below any characterization of merely unpopular or unacceptable. Lanier's conduct clearly violated constitutional rights and falls squarely within the range of conduct Congress intended to punish with section 242.

I join in Judge Daughtrey's opinion to the extent it is consistent with my views stated here, and I respectfully **DISSENT**.

DAUGHTREY, Circuit Judge, dissenting.

Apparently because the United States Supreme court has never held, specifically, that 18 U.S.C. § 242 proscribes sexual assault by a sitting state judge, committed against litigants, court personnel, or those involved in court-related programs, the majority today reverses the *defendant's convictions* under § 242 and declares that the charges against him should not have been brought. This result rests on the majority's conclusion that the federal constitution offers no protection against such assaults. Because I conclude, to the contrary, that such constitutional pro-

tection is well-entrenched, I respectfully dissent.

## I.

In its opinion, the majority sets out, at some length, the fruits of its exhaustive research into the legislative history of § 242. Missing, however, is even a brief sketch of the factual history of this case, so necessary to put the constitutional analysis in context. Those facts were fairly and dispassionately summarized by the three-judge panel that first heard this appeal, as follows:

The evidence presented at trial showed that defendant was born in Dyer County, Tennessee, and had lived there virtually all his life. Defendant is from a politically prominent family. He served as alderman and mayor of Dyersburg, Tennessee, before first being elected Chancery Court Judge of the Twenty–Ninth Judicial District in 1982. Defendant was reelected in 1990. He continued to serve as a chancery court judge until he was removed from his position pending resolution of this case.

As a chancery court judge, defendant principally presided over divorces, probate matters, and boundary disputes. Although the circuit court also has concurrent jurisdiction ... over divorce cases, defendant presided over 80 to 90 percent of the divorce cases in Lake and Dyer Counties, including child support and other matters related to the divorce cases. Further, ... defendant also served as juvenile court judge in said counties.

In 1989, defendant hired Sandy Sanders to be the Youth Service Officer of the Dyer County Juvenile Court. Sanders was to supervise the Youth Service Office. During her job interview, defendant told Sanders that he had sole hiring authority for the Youth Service Officer position. Defendant also had the authority to fire the Youth Service Officer.

As part of her job duties, Sanders was required to have weekly meetings with defendant to review the work performed by her office. During one of these weekly

---

larly is near to what the majority suggests, criminal prosecution is perhaps even more important. Furthermore, criminal prosecution of

some of these allegedly rampant violations may serve as a deterrent to prevent continued encroachments on individuals' bodily integrity.

meetings, which occurred in defendant's chambers, defendant got up from his desk, sat beside Sanders in a chair, and, during their conversation, grabbed and squeezed her breast. Sanders became upset and tried to remove defendant's hand; however, defendant told her not to be afraid.

Sanders left the meeting as quickly as possible. She did not tell anyone about what had occurred because she thought that no one would believe her since defendant was a judge and was influential in the community. Subsequently, Sanders telephoned defendant and told him she needed to meet with him. She went to defendant's chambers, told him she did not appreciate his action, and received an apology from him.

Sanders continued to have weekly meetings with defendant. However, after she confronted him about his actions, he began complaining about the quality of her work, and, eventually, he took away her supervisory authority. Sanders testified that she believed defendant took away her supervisory authority in retaliation for her confrontation with him. She testified that she considered quitting her job, but she remained in her position because she believed she was helping the children she worked with.

Defendant testified that he was often alone with Sanders in his chambers; however, he denied ever touching her breast. He testified that prior to the alleged incident, he and Sanders would hug and kiss each other as a friendly greeting. Defendant testified that he stopped such behavior after Sanders told him she was no longer comfortable hugging him.

In the fall of 1990, defendant hired Patty Mahoney to be his secretary. Mahoney was recently divorced and had two young children to support. Mahoney understood that defendant was her supervisor and had the power to fire her. Mahoney was uncomfortable with defendant because she felt that he had inappropriately hugged her during her job interview. However, she accepted the job because, for a person without a college degree, it was a good job in Dyersburg.

Mahoney testified that she worked for defendant for two weeks, but she quit when it became apparent that he was not going to leave her alone. She testified that while she worked in defendant's chambers, he would hug her or touch her on her breasts or buttocks. By the second day of her employment, defendant began to firmly place his hands on her breasts.

Mahoney testified that defendant eventually became more aggressive, grabbing and squeezing her breasts, rather than just placing his hands on them. [Defendant also telephoned Mahoney at her home, invited her to vacation with him in the Bahamas, and told her, "If you will sleep with me, you can do anything you want to. You can come in to work any time you want to, you can leave any time you want to."] She confronted him about his behavior, but he told her that if she reported his behavior it would hurt her more than it would hurt him. Mahoney testified that since the Lanier family was so powerful, she thought that no one would hire her if she reported defendant's behavior.

Despite her confrontation with defendant and her efforts to avoid being alone with defendant, the touching and grabbing of Mahoney's breasts continued on a daily basis. After deciding she would quit, Mahoney telephoned defendant from her home and informed him of her decision. Mahoney went to work the next day and met with defendant in his chambers. She broke down crying, telling him that she needed the job and wanted him to leave her alone. At that point, defendant put his arms around her, lifted her off the floor, and aggressively hugged her. Then, with one hand on the lower part of Mahoney's back, defendant slid her down his body and pressed his pelvis against her. That same night, Mahoney called defendant and told him she was quitting. She worked one more week because she needed the job.

* * *

At trial, defendant denied that he ever touched Mahoney in a sexual manner or grabbed either her breasts or buttocks. However, defendant testified that he and Mahoney hugged every day.

Vivian Archie grew up in Dyersburg and was acquainted with the Lanier family. She married in 1988 and gave birth to a daughter. She was divorced the following year. Defendant presided over her divorce proceedings and awarded the custody of her daughter to her.

In 1990, Archie was out of work and living with her parents. Archie learned that a job was available at the courthouse. She went to the courthouse, filled out an application for a secretarial position, and met with defendant in his chambers. At the outset of their meeting, defendant told Archie that her father had come to see him that day. Defendant said that Archie's father had told him that she was not a good mother, and he wanted custody of her child.

Archie became frightened and asked defendant if he was going to take her daughter away from her. Defendant told her that he could not talk about it because he was the judge who would preside over any such case. Defendant told Archie that he had already promised the job to someone else. Archie replied that she needed the job and would do anything to get a job. She testified that she stated this because, otherwise, defendant would have leverage to take her child away.

When Archie was ready to leave, she reached across the desk to shake defendant's hand. At that point, defendant grabbed her hand, pulled her around to the end of his desk, and grabbed her hair and neck. When Archie told defendant to stop and tried to push him away, he twisted her neck and tried to fondle her. Defendant kept pulling Archie's hair and neck, and finally, he turned around and threw her into a chair. Defendant then [placed his hand under her jacket and repeatedly tried to force his tongue into her mouth], and each time she tried to get away, he would squeeze her neck harder. Finally, defendant stood over Archie, exposed his penis, and pulled her head down and her jaws open. He then forced his penis into her mouth and moved his pelvis back and forth with great force. Archie testified that this hurt her throat and jaw.

Defendant did not stop until he had ejaculated in Archie's mouth. Archie, who was crying, got up and went into defendant's bathroom to clean her mouth and face so that she could leave the courthouse. Archie testified that when she got home, her head was tender where defendant had pulled her hair; her neck was sore, and when she brushed her hair where defendant had pulled it, some of her hair fell out. Archie also testified that she did not scream when defendant attacked her or report the incident because she was afraid he would take custody of her child from her [and because defendant's brother was then the prosecutor for the area].

A few weeks later, defendant telephoned Archie's residence and told her mother he had a job for her. Defendant did not tell Archie's mother where the job interview would be located. Rather, he told her mother that Archie would have to come by his chambers to get the information. Archie was reluctant to call defendant; however, at her mother's insistence, she returned his telephone call. Although Archie repeatedly asked defendant to tell her where the job interview was, he insisted that she return to his chambers for the information. Archie then returned to defendant's chambers believing that if she did not, her parents would be furious with her and defendant would believe that she had told her parents about the assault.

When she arrived at defendant's chambers, he told her about a secretarial position in the office of Dr. Lynn Warner. Archie told defendant she knew where Dr. Warner's office was located because he had been her doctor since she was a child. While they were talking, defendant walked around his desk towards Archie. She tried to get out of the room, but he slammed the door closed and began kissing her. She told him to stop, but he began pulling her hair and threw her into a chair. As she was saying "no," defendant again exposed himself, turned her head, pulled her mouth open, and forced her to perform oral sex. During this period, defendant continued to grab Archie by the hair, squeeze her neck and shoulders, and pull her head back, all of which caused her great pain. Archie

also testified that during this period she was crying, gagging, choking, and having trouble breathing. Defendant again ejaculated in her mouth. She ran crying into his bathroom and cleaned up her mouth and face so that she could go to her job interview.

Archie did not report either of the assaults because her child custody case had been in defendant's court, and she was afraid that defendant would take her daughter away from her. Archie testified that she subsequently met with defendant and that he asked her if she had said anything to anyone and also asked why she had not been back to see him. Defendant then asked Archie how her family life was going. Archie testified that she interpreted defendant's remarks to mean that he would permit her to keep custody of her daughter if she did not tell anyone what had happened.

At trial, defendant acknowledged that he was alone with Archie in his chambers on both of the occasions mentioned in her testimony, but he denied ever assaulting her or having oral sex with her. He testified that Archie came to him looking for a job and he told her he did not have one available, but he would let her know if he learned of one. He also admitted telling Archie that he had met her father and that her father wanted to know how to go about getting custody of Archie's daughter.

Defendant admitted that he told Dr. Warner that Archie needed a job and that he set up an interview for her with Dr. Warner. Defendant also admitted that he told Archie to come to his chambers so he could tell her where the interview was. Defendant testified that Archie did come to his chambers and that he sent her to Dr. Warner for the interview.

Dr. Warner testified as a defense witness. He testified that Archie never told him that defendant forced her to have sex with him. On cross-examination, Warner testified that Archie did tell him that defendant requested oral sex and that she performed oral sex. Dr. Warner also testified on cross-examination that he discussed Archie with defendant, and defendant told

him that Archie might be willing to provide sexual favors. As a result, Warner agreed to interview Archie for the job.

* * *

In March 1991, defendant hired Sandy Attaway, age 26, to be his secretary. After her first month of work, defendant began making sexual comments to Attaway. He told Attaway that he would loan her money and they could work out a payment. He also asked Attaway what she would do for him if he let her off from work. Finally, defendant told Attaway that he knew how he could relieve her stress and she could relieve his. Attaway believed these comments referred to sex.

Defendant also asked Attaway if she were afraid of him. She testified that she told him "no," although that was untrue, because she did not want him to think she was weak and could be intimidated. Defendant told Attaway that he was a judge, and everyone should be afraid of him.

Defendant then went from sexual comments to physical contact with Attaway. He began hitting her on the buttocks when she walked by him. Further, when Attaway was in defendant's chambers to have him sign some papers, he walked around behind her and threw his arms around her. Defendant then[, while still wearing his judicial robes,] pushed his pelvic area into Attaway's buttocks and began making a grinding motion. She could tell that defendant's penis was erect because she felt him rubbing it against her. Attaway then yelled at defendant to stop. He told her to lower her voice because there were people in the courtroom, and defendant was afraid they would hear Attaway.

* * *

Attaway did not quit after the assault because she needed the job. However, three months later, defendant terminated Attaway on the ground that things were not working out. Attaway testified that she saw defendant at the courthouse after he had terminated her, and defendant told her they would have gotten along fine if she had liked to have oral sex.

Defendant testified regarding Attaway's allegations. He denied sexually assaulting her in any way.

In the fall of 1991, Fonda Bandy met with defendant in his chambers, concerning her work for a federal program, Drug Free Public Housing. Bandy wanted to implement a new program of parenting classes for parents who lived in public housing and had children before the juvenile court. Since defendant was the juvenile court judge, Bandy arranged a presentation about the program for him. She hoped that he would refer parents to her program as part of their children's sentencing.

\* \* \*

Bandy testified that when she began to leave defendant's chambers, he put his arms around her and started kissing her. As she tried to turn and pull away, defendant put one of his hands behind her head and pulled her up to him. Defendant then began to fondle one of Bandy's breasts and she tried to push him away. When she eventually pulled herself free, Bandy saw that defendant had lipstick all over him.

Bandy was shaken and panicked, and she went into the bathroom to clean herself up before leaving defendant's chambers. After she left the bathroom, Bandy had to walk past defendant's desk to exit his chambers. As she walked by, defendant, who was sitting on the end of his desk nearest the door, reached out and put his hand on Bandy's crotch. Bandy momentarily hesitated and then kept on walking towards the door. Defendant followed her to the door and told her that if she came back, she would have all the clients that she wanted for her new program.

Bandy testified that she never returned to see defendant because she did not want to have to go through that kind of treatment again. Defendant only referred two individuals to Bandy's program. These two individuals had cases pending before defendant at the time of his meeting with Bandy, and defendant and Bandy had discussed their cases. Bandy testified that she did not report the incident with defendant because he was a judge and she did not want too many people to know about it.

Defendant testified and admitted that he had met with Bandy alone in his chambers. He denied ever sexually assaulting Bandy. Defendant also testified that after their meeting, Bandy came over to him and hugged and kissed him.

*United States v. Lanier,* 33 F.3d 639, 646–50 (6th Cir.1994), *vacated,* 43 F.3d 1033 (6th Cir.1995).

In light of these facts, the grand jury returned against Lanier an 11–count indictment enumerating alleged violations of "the right not to be deprived of liberty without due process of law, including the right to be free from wilfull [sic] sexual assault, ... all in violation of Title 18, United States Code, Section 242." At trial, the jury, after being instructed that the improper conduct must be "so demeaning and harmful under all the circumstances as to shock one's conscience," convicted the defendant on two felony and five misdemeanor counts in connection with the egregious behavior. The majority, however, now holds that prosecution pursuant to § 242 was improper based upon its examinations of legislative history, case law, canons of judicial interpretation, and constitutional notice requirements. I respectfully suggest that such analyses ignore historical facts and jurisprudential precepts that mandate a contrary conclusion.

## II.

### A. Examination of Legislative History

Presently, 18 U.S.C. § 242 provides, in relevant part:

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ... shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section ..., shall be fined under this title or imprisoned not more than ten years or both....

At first blush, the provisions of the statute would seem to outlaw unambiguously the willful deprivation under color of law *"of any rights ... secured or protected by the Constitution."* (Emphasis added.) Ordinarily, such a lack of ambiguity would preclude a foray into the uncertainties of legislative history. As Chief Judge Merritt himself announced in *United States v. Winters,* 33 F.3d 720, 721 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1148, 130 L.Ed.2d 1107 (1995), "[o]nly if the language of the statute is unclear do we look beyond the statutory language to the intent of the legislature." Nevertheless, in this case, simply by declaring § 242 to be "perhaps the most abstractly worded statute among the more than 700 crimes in the federal criminal code," the majority justifies its extensive recounting of the historical development of the provision. Then, despite acknowledging that the forerunner of today's § 242 clearly expanded the scope of criminal liability for constitutional violations, the majority would have us ignore the clear language of the statute and conclude that Congress did not intend to criminalize all willful violations of constitutional rights committed under color of law.

The majority's analysis and conclusions are interesting as an academic exercise attempting to divine the motivations of a disparate collection of legislators, acting over a century ago on what appears (as is often the case with legislative action) to be a less than fully educated basis. That analysis fails, however, to accord appropriate deference to the holdings of Supreme Court decisions that are binding upon this tribunal today. Specifically, in *Screws v. United States,* 325 U.S. 91, 104, 65 S.Ct. 1031, 1036–37, 89 L.Ed. 1495 (1945), the Court recognized that § 242 reached not only to a static, limited group of super-constitutional rights, but also to any right "which has been made specific either by the express terms of the Constitution or laws of the United States or *by decisions interpreting them."* (Emphasis added.) Similarly, in *United States v. Price,* 383 U.S. 787,

803, 86 S.Ct. 1152, 1161, 16 L.Ed.2d 267 (1966), the Court noted that § 242, like its companion provision, 18 U.S.C. § 241, includes in its protections a "wide range of rights: ... 'any rights, privileges, or immunities, secured or protected by the Constitution or laws of the United States.' " [1] Thus, "the 'customary stout assertions of the codifiers that they had merely clarified and reorganized without changing [the] substance' [of § 242] cannot be taken at face value." *Maine v. Thiboutot,* 448 U.S. 1, 8 n. 5, 100 S.Ct. 2502, 2506 n. 5, 65 L.Ed.2d 555 (1980) (quoting *United States v. Price,* 383 U.S. at 803, 86 S.Ct. at 1161).

Moreover, over the years, and through subsequent amendments, Congress has not seen fit to alter § 242 in the face of Supreme Court decisions that contradict the position espoused by the majority. If Congress itself has not found it necessary to correct the supposed misconstruction of the reach of § 242, this court should be hesitant now to fill in the gap that the majority attempts to create. Instead, we should limit our inquiry in this case to the relevant question of whether court decisions had "made specific," by the time Lanier committed the acts for which he was convicted, a constitutional right to be free from interference with bodily integrity.

### B. Examination of Case Law

At the outset, it should be noted that the majority appropriately does not contend that judges are immune from prosecutions under § 242. *See Briscoe v. LaHue,* 460 U.S. 325, 345 n. 32, 103 S.Ct. 1108, 1121 n. 32, 75 L.Ed.2d 96 (1983). Also, the majority does not, and indeed cannot, contend that Lanier did not perform the reprehensible acts that form the basis of the jury's verdict in this matter. Finally, the majority does not question the conclusion that those acts were committed under "color of law." Instead, in deciding to dismiss the indictment issued against Lanier, the majority insists that the constitutional right upon which the prosecution based its case, the right to be free from

---

1. Concurring in *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 661 n. 34, 99 S.Ct. 1905, 1938 n. 34, 60 L.Ed.2d 508 (1979), Justice White also noted that "[t]itle 18 U.S.C. §§ 241 and 242 encompass the same rights. *See United* *States v. Price,* 383 U.S. at 797, 86 S.Ct. at 1158; *United States v. Guest,* 383 U.S. 745, 753, 86 S.Ct. 1170, 1175, 16 L.Ed.2d 239 (1966); *Screws v. United States,* 325 U.S. at 119, 65 S.Ct. at 1044 (Rutledge, J., concurring).

interference with bodily integrity that shocks the conscience, had not been recognized in a United States Supreme Court opinion at the time the defendant committed the acts of which he was accused.

As mentioned earlier, *Screws* held in 1945 that the reach of § 242 extends to any right "which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Screws v. United States,* 325 U.S. at 104, 65 S.Ct. at 1037. In this case, the government does not rely upon any express constitutional provision "making specific" the right of individuals to be free from interference with their bodily integrity. Instead, the prosecution submits that principles of substantive due process, *as interpreted by the federal courts,* protect and make specific the very right asserted in this prosecution.

This court has previously recognized that deprivations of due process fall into two categories: "violations of procedural due process and violations of substantive due process...." *Mansfield Apartment Owners Assoc. v. City of Mansfield,* 988 F.2d 1469, 1473–74 (6th Cir.1993). In turn, substantive due process violations themselves can be grouped into two separate classifications. "The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims under 'the Fourteenth Amendment *simpliciter.*'" *Mertik v. Blalock,* 983 F.2d 1353, 1367 (6th Cir. 1993) (quoting *Parratt v. Taylor,* 451 U.S. 527, 536, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981)). "The other type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. The test for substantive due process claims of this type is whether the conduct complained of 'shocks the conscience' of the court." *Mertik v. Blalock,* 983 F.2d at 1367–68. It seems obvious to me, as it did to the prosecution, the district court, the federal jury, and the original panel that heard this appeal, that federal case law establishes that interference with an individual's bodily integrity under circumstances similar to those involved in this case is in fact so repulsive and deviant as to fall within this second category of substantive due process violations.

In order to reach a contrary conclusion, the majority twice dons blinders that hinder it from according § 242 the power to battle the forces of oppression that prompted enactment of the Fourteenth Amendment and the various statutes executing its protections. First, the majority constructs on its own the requirement that *only* Supreme Court case law be referenced when determining whether a constitutional right has been made specific for purposes of § 242 because reliance upon lower court decisions to define those rights raises the possibility of inconsistent enforcement across the country.

Acceptance of such an argument again necessitates another misreading of Supreme Court precedent. In *Screws,* when listing the sources capable of defining protected constitutional rights, Justice Douglas included *"decisions* interpreting [the Constitution and laws of the United States]," not only *Supreme Court decisions* providing such interpretations. *Screws v. United States,* 325 U.S. at 104, 65 S.Ct. at 1037 (emphasis added). Moreover, the *Screws* plurality opinion clearly states, "In the instant case the decisions of *the courts* are, to be sure, a source of reference for ascertaining the specific content of the concept of due process." *Id.* at 96, 65 S.Ct. at 1033 (emphasis added). Such language is plainly inconsistent with a requirement that only the decisions of *a* specific court define the scope of due process rights.

Furthermore, the fears that prompted the majority's attempt to limit the possible sources of explication of rights listed in *Screws* are not relevant in this instance. Where all federal courts addressing analogous situations have accepted the long-standing existence and viability of a right to freedom from interference with bodily integrity protected by the substantive provisions of the due process clause, no danger of inconsistent interpretations and enforcement of the law is present.

Even more troubling than the majority's restriction of the *Screws* holding, however, is the fact that in order to arrive at the conclusion it does today, the majority is also forced

to reject or ignore, without logical explanation, the import of the holdings of a number of Supreme Court decisions that clearly recognize a constitutional right to bodily integrity. *See, e.g., Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). These decisions do not specifically mention sexual assaults upon individuals under color of law. Consequently, even though Lanier's conduct in this matter is, in many ways, far more egregious than the actions discussed in the cited cases, the majority concludes that such precedent cannot support the contention that the "right to be free from rape and sexual assault and harassment has also been recognized by the Supreme Court generally as a component of an enforceable general constitutional right to 'bodily integrity.'"

In *K.H. Through Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990), however, the Seventh Circuit recognized that the logical interpretations of existing law cannot be ignored by the courts simply because *factually* similar cases are not presented. Instead, the underlying principles of relevant case law should be given vitality in such instances. As the court noted:

> The easiest cases don't even arise. There has never been [,for example,] a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

*Id.* at 851.

Likewise, here, no Supreme Court decision has *explicitly* ruled that constitutional principles protecting bodily integrity forbid a sitting judge, in his chambers, and in some cases, while in his judicial robes, from fondling and raping women with business before his court. Such a scenario, however, is the "easy" case that demonstrates a blatant violation of those Supreme Court and courts of appeals precedents that have "made specific" the fact that interference with personal security and bodily integrity that shocks the conscience is proscribed by the substantive due process principles of the Fourteenth Amendment.

**1. Supreme Court Treatment of Bodily Integrity**

Short of attempting to catalogue every possible factual situation involving an intrusion upon personal security or bodily integrity, it is impossible to see how the Supreme Court could have more explicitly stated over the years that violations of that precious right cannot be tolerated in a free and civilized society. For example, the Court chronicled the fact that 780 years ago, the Magna Carta provided that "an individual could not be deprived of this right of personal security 'except by the legal judgment of his peers or by the law of the land.'" *Ingraham v. Wright,* 430 U.S. at 673 n. 41, 97 S.Ct. at 1413 n. 41. As recognized by the Court, when the drafters of the Bill of Rights met more than 500 years later, they attempted to provide Americans with "at least the protection against governmental power that they had enjoyed as Englishmen against the power of the Crown" by engrafting that same principle from the Magna Carta into our constitution's due process clause. *Id.* at 673, 97 S.Ct. at 1413.

In *Youngberg v. Romeo,* 457 U.S. at 315, 102 S.Ct. at 2458, the Supreme Court reiterated, citing *Ingraham,* that "[i]n the past, this Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." Then, in *Cruzan,* the Court again referenced the "notion of bodily integrity" and recognized:

> Before the turn of the century, this Court observed that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

*Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. at 269, 110 S.Ct. at 2846 (quoting *Union Pacific R. Co. v. Botsford,*

141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)).

As recently as 1992, the Supreme Court yet again affirmed the long-standing constitutional principle that the majority now overlooks when that Court stated, "It is settled now, as it was [in 1971 and 1972] when the Court heard arguments in *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ], that the Constitution places limits on a State's right to interfere with a person's . . . bodily integrity." *Planned Parenthood v. Casey*, 505 U.S. at 849, 112 S.Ct. at 2806. Although *Planned Parenthood v. Casey* and the other Supreme Court cases cited above admittedly did not involve a sexual assault, and although those cases may not have dealt with actions taken by a state judge, such factual differences among the cases are immaterial to the underlying reality that the Supreme Court has clearly and consistently proclaimed that the constitution's due process clause protects an individual from interference with bodily integrity under color of law under circumstances that would shock the conscience of the court.

### 2. Appellate Court Treatment of Bodily Integrity

Furthermore, all circuit courts that have addressed this or similar issues have likewise recognized the seemingly axiomatic principle that a citizen's right not to be deprived of life, liberty, or property without due process of law encompasses the right not to be intentionally and sexually assaulted under color of law. In *United States v. Davila*, 704 F.2d 749 (5th Cir.1983), for example, Davila and a co-defendant, officers of the United States Border Patrol, were charged under 18 U.S.C. § 242 with coercing two women to submit to sexual intercourse with them in return for

allowing them to enter the country illegally. The Fifth Circuit unanimously affirmed the convictions without commenting on the basis for the prosecution.

Similarly, in *United States v. Contreras*, 950 F.2d 232, 236 (5th Cir.1991), *cert. denied,* 504 U.S. 941, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992), the defendant, a police officer, was charged under § 242 with the criminal offense of "willfully depriving [the victim] of her constitutional rights, while acting under color of law, by sexually assaulting her . . ." while he was on duty. Again, the appellate court found no constitutional error in the convictions and affirmed the judgment of the district court.

Because the defendants in *Davila* did not expressly challenge their convictions under § 242 on appeal, the majority dismisses the importance of that case to the discussion presently before us. The defendant in *Contreras* also did not dispute the fact that a sexual assault perpetrated under color of law fell within the proscriptions of the due process clause. Presumably, therefore, the majority would also dismiss the precedential value of that case for the same reasons advanced in its discussion of *Davila*. Despite the majority's casual treatment of prosecutions for sexual assaults under § 242, however, these cases provide further support for the proposition that court decisions had already recognized and "made specific" the constitutional right to be free from interference with bodily integrity prior to initiation of Lanier's actions that resulted in this prosecution.

Other circuit court decisions rendered in *civil* actions brought pursuant to 42 U.S.C. § 1983 also recognize acceptance of this idea of the reach of substantive due process principles.[2]  *See, e.g., Walton v. Alexander*, 44

---

**2.** In *United States v. Reese*, 2 F.3d 870, 884 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994), the Ninth Circuit concluded:

> There is nothing wrong with looking to a civil case brought under 42 U.S.C. § 1983 for guidance as to the nature of the constitutional right whose alleged violation has been made the basis of a section 242 charge. The protections of

the Constitution do not change according to the procedural context in which they are enforced—

whether the allegation that constitutional rights have been transgressed is raised in a civil action or in a criminal prosecution, they are the same constitutional rights.

Furthermore, in concurring in the judgment in *Chapman v. Houston Welfare Rights Org.*, 441 U.S. at 662, 99 S.Ct. at 1939, Justice White explained that both §§ 242 and 1983 had their genesis in post-Civil War legislation and seek redress for violations of rights under color of law. He continued by stating, "Apart from differences relating to the nature of the remedy

1412

F.3d 1297, 1302 (5th Cir.1995) (*en banc*) (reiterating the Fifth Circuit's recognition that "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process"); *Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir.1994) (quoting *Casey* for the proposition that "[i]t is settled now ... that the Constitution places limits on a State's right to interfere with a person's ... bodily integrity"); *Doe v. Taylor Independent Sch. Dist.,* 15 F.3d 443, 451 (5th Cir.) (*en banc*) (concluding that if due process considerations protect school children from arbitrary paddlings and other corporal punishment, "then surely the Constitution protects a schoolchild from physical sexual abuse"), *cert. denied,* —— U.S. ——, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994); *Dang Vang v. Vang Xiong X. Toyed,* 944 F.2d 476, 479 (9th Cir.1991) (finding that the defendant clearly "used his position in the state government to deprive these women of their constitutional right to be free from sexual assault"); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726–27 (3d Cir.1989) (*en banc*) (holding that the constitutional right to freedom from invasion of personal security through sexual abuse was well-established even before *Ingraham* because "a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice"), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981) (recognizing that "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process"); *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980) (recognizing that not all criminal assaults will constitute violations of a constitutional right, but that the right to be free from intrusions into bodily security that shock the conscience "is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process"); *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir.1974) (stating that "[t]he right violated by an assault has been described as the right to be secure in one's person, and is grounded in the due process clause of the Fourteenth Amendment"). Rather than giving credence to the underlying constitutional principles forming these decisions, however, the majority discounts the cases as irrelevant because the opinions, for the most part, accept without debate the uncontroverted principle that, throughout our jurisprudential history, it has been assumed that due process principles protect us from sexual assaults of the kind at issue here.

Unlike the majority, I believe that the very fact that the assumption is so widely held assists in establishing and making specific the constitutional right to be free from invasions of bodily integrity under color of law. The majority's criticism that "[t]hese broad statements are not supported by precedent indicating that a general constitutional right to be free from sexual assault is part of a more abstract general right to 'bodily integrity' " is also misplaced. Because the "literally outrageous abuses of official power," *Hall v. Tawney,* 621 F.2d at 613, that occasion resort to the protections of substantive due process rights are so varied, articulation or listing of the precise actions that would justify reliance on such constitutional principles is difficult. Sexual assault, however, must be considered one of the most blatant and serious invasions of the protected right to bodily integrity. If such intrusions are not plainly within the scope of protection offered by the "general right," it is difficult to imagine what other acts could be so included.

In short, I can think of no more clearly established and specific, constitutionally-based, due process principle than one which recognizes, albeit necessarily through analogous factual situations, that judicial officials cannot wield their power over child-custody decisions, employment decisions, and other court matters so as to coerce compliance through sexual assaults and other interferences with the rights of bodily integrity of litigants, applicants, and other individuals before the court. An analysis of applicable case law, both from the Supreme Court and from our sister circuits, leads to the inescapable conclusion that, at the time of Lanier's assaults upon his victims, a constitutional

involved, [the two statutes] are commensurate."  *Id.*

right to freedom from interference with bodily integrity that shocks the conscience had been made specific by those decisions.

### C. Examination of Specificity of Notice to Defendant

In its final attacks upon the validity of Lanier's § 242 convictions, the majority insists that reliance upon a constitutional right defined in terms of a "shocks the conscience" standard is so vague as to fail to place the defendant on notice of the acts which are criminalized. The majority also insists that use of such a standard allows the judiciary to extend the reach of the crime which should be defined by congressional action only.

Under time-honored jurisprudential principles, however, we, as an intermediate appellate court, are bound to defer to relevant precedent from the Supreme Court on this issue. In *Screws*, a decision from which the Supreme Court has not retreated, that Court rejected the very argument advanced by the majority and concluded that the standard of guilt in § 242 is *not* unconstitutionally vague if the statute is read to require of the defendant "a specific intent to deprive a person of a federal right made definite by decision or other rule of law." *Id.* at 103, 65 S.Ct. at 1036. As long as "the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Id.* at 102, 65 S.Ct. at 1036; *United States v. Reese*, 2 F.3d at 881.

The majority, nevertheless, intimates that Lanier could not have been aware that sexually assaulting women in his chambers when they arrived to conduct official business with him constituted a violation of the victims' due process rights. In light of historical explications of individual rights and liberties and the unanimity of federal courts addressing analogous circumstances, however, it is clear that the defendant in this case either knew or acted "in reckless disregard of [§ 242's] prohibition of the deprivation of a defined constitutional or other federal right." *Screws v. United States*, 325 U.S. at 104, 65 S.Ct. at 1037. The prohibitions of the statute are not, therefore, so vague that the defendant could not have realized, prior to commission of his reprehensible acts, that those deeds were criminalized by § 242.

Finally, the majority argues that use of a "shocks the conscience" standard to determine whether particular acts should be criminalized "places unparalleled, unprecedented discretion in the hands of federal law enforcement officers, prosecutors and judges." The vesting of such discretion in juries, judges, and law enforcement officials is not, however, unheard of in the criminal law. For example, one must assume that in order to maintain a consistent, intellectually honest stance on this particular matter of contention, the majority now stands ready to invalidate state pornography statutes visiting criminal sanctions upon individuals violating even less definite "contemporary community standards" of decency. *See Miller v. California*, 413 U.S. 15, 24, 30–33, 93 S.Ct. 2607, 2615, 2618–20, 37 L.Ed.2d 419 (1973). Regardless of the inherent difficulties in defining such "community standards," however, we continue to place great confidence in the ability of American judges, juries, prosecutors, and the public at-large to discern readily those violations of substantive due process principles that are so egregious and demeaning as to shock the conscience of the courts. Consequently, I find no constitutional impediments to the prosecution of the defendant in this case under the facts presented to us on appeal.

I recognize that we have consistently determined that use of a "shocks the conscience" standard is problematic in areas other than cases involving the use of excessive force or physical abuse. *See, e.g., Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994); *Mansfield Apartment Owners Assoc. v. City of Mansfield*, 988 F.2d 1469, 1478 (6th Cir. 1993); *Braley v. City of Pontiac*, 906 F.2d 220, 226 (6th Cir.1990). This case, however, does not fall outside those boundaries. In all the instances of misconduct for which the defendant was punished, he clearly exerted not only the force of his office and position within the community, but also physical force

to exact compliance with his perverted sense of acceptable office behavior. Such physical assaults, committed within the judge's own chambers, upon individuals with cases under his jurisdiction, upon individuals hired or appointed by him, and upon individuals dependent upon him for the proper functioning and stability of public programs, do, as explicitly found by the jury, shock the public conscience. The use of a "shocks the conscience" standard under these facts, therefore, is eminently justified, even under prior circuit precedent. Moreover, as the Supreme Court stated in *Screws:*

> We hesitate to say that when Congress sought to enforce the Fourteenth Amendment in this fashion it did a vain thing. We hesitate to conclude that for [130] years this effort of Congress, renewed several times, to protect the important rights of the individual guaranteed by the Fourteenth Amendment has been an idle gesture. Yet if the Act falls by reason of vagueness so far as due process of law is concerned, there would seem to be a similar lack of specificity when the privileges and immunities clause and the equal protection clause of the Fourteenth Amendment are involved.

325 U.S. at 100, 65 S.Ct. at 1035 (citations omitted).

### III.

At least since the sealing of Magna Carta in 1215, Anglo–American jurisprudence has recognized the right of citizens to be free from interference with their bodily integrity, except under the clear authority of law. Today, however, the majority turns its back on 780 years of history on this subject.

The court inexplicably concludes that an individual has no recognized due process right to be free from sexual assault by *a judge* who is able to effect those assaults solely by his position and by his power over the jobs and families of the victims. Presumably, the majority would have no qualms in reaffirming the principle that prisoners have a constitutional right not to be assaulted by, or at the direction of, their jailers. *See*

*United States v. Price,* 383 U.S. at 793, 86 S.Ct. at 1156; *Screws v. United States,* 325 U.S. at 106–07, 65 S.Ct. at 1037–38; *United States v. Brummett,* 786 F.2d 720 (6th Cir. 1986).[3] That same majority, however, can now find that the commensurate right to freedom from a willful sexual assault at the hands of a sitting judge has not been "made specific" by prior court decision, solely because no Supreme Court case has yet explicitly involved a factual situation with a judge who so dishonored his profession or who sunk to such levels of depravity as has the defendant in this case. I cannot condone such a startling restriction of basic personal rights and liberties.

Every court that has addressed an analogous inquiry has found it beyond dispute that our constitution protects us from willful, conscience-shocking intrusions and assaults upon our bodily integrity under color of law. Because I believe that the actions of the defendant in this case clearly fall within the constitutional prohibitions made specific by such prior case law and of which all reasonable individuals should be aware, I choose to align myself with those opinions holding sacred our most basic human liberties. For that same reason, I unhesitatingly dissent from the majority's attempt to withdraw recognition of that right.

---

**3.** Interestingly, Brummett was also indicted for and pled guilty to an 18 U.S.C. § 241 conspiracy charge involving a sexual assault upon another

jail inmate. *United States v. Brummett,* 786 F.2d at 721.